IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LACRITIA SPANEL, | |
| Plaintiff, | **8:18-CV-380** |
| vs. | |
| | **MEMORANDUM AND ORDER** |
| CENTRAL COMMUNITY COLLEGE, CHRIS WADDLE, in his individual capacity; GREG SMITH, in his individual capacity; and MATT GOTSCHALL, in his individual capacity; | |
| Defendants. | |

## I.    INTRODUCTION

Lacritia Spanel has sued Central Community College ("CCC"), Chris Waddle, Greg Smith, and Matt Gotschall. In her suit, Spanel brings claims under the Americans with Disabilities Act ("ADA"), the Nebraska Fair Employment Practice Act ("NFEPA"), Title VII of the Civil Rights Act, and the First and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. Spanel, an English instructor at CCC, generally alleges that Defendants have discriminated against her on the basis of her sex and disability in violation of the ADA, Title VII, the NFEPA and the Fourteenth Amendment and retaliated against her in violation of the First Amendment, Title VII, and the NFEPA. According to Spanel, Defendants have been on a four-year crusade to oust her from her job after she helped fellow faculty members make complaints of misconduct against some members of CCC's administration.

1

Defendants have moved for summary judgment on all of Spanel's claims. In their motion, Defendants argue that Spanel cannot prove that she suffered an adverse employment action or that any of the explanations Defendants give for their actions are a pretext for unlawful discrimination or retaliation. They further contend that Spanel has failed to exhaust her administrative remedies for some of her claims. Also before the Court are Defendants' Motion to Strike an exhibit Spanel filed with her Brief in Opposition to Defendants' Motion for Summary Judgment, Filing 146; Defendants' Motion to Exclude Testimony from Plaintiff's Expert, Filing 152; and Spanel's Motion for Leave to File a Sur-Reply in Opposition to Defendants' Motion for Summary Judgment, Filing 149. For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment. The Court also denies as moot Defendants' Motion to Strike, Defendants' Motion to Exclude Testimony from Plaintiff's Expert, and Spanel's Motion for Leave to File a Sur-Reply.

## II.  BACKGROUND

Since 2014, Spanel has worked at CCC as an English instructor. Filing 118 at 11–12. The individual defendants are members of CCC's administration. Waddle is the Vice President of Human Resources, Filing 118 at 200; Smith, who retired in January 2018, is the former President of CCC, Filing 118 at 220; and Gotschall has been the President of CCC since Smith's retirement, Filing 118 at 192. Along with her teaching duties, Spanel has also served as a representative of CCC's faculty union since 2015. Filing 144-1 at 1. As a union representative, Spanel attended negotiations between the union and CCC's administration. Filing 144-1 at 1–2, 6, 8.

Sometime in early 2016, Spanel became the President of the All College Faculty Senate ("Faculty Senate"). Filing 143-1 at 7–8. In March of 2016, Spanel and other members of the Faculty Senate decided to conduct an anonymous survey to document complaints the faculty had

against individuals in CCC's administration. Filing 56 at 4; Filing 118 at 90–92; Filing 143-38 at 2–4. The responses to these surveys generally reported rude treatment of faculty members by one of CCC's deans.[1] Filing 140-36 at 1–33. After receiving the survey responses, Spanel turned them over to Maureen Nickels, the state union representative of CCC's faculty. Filing 143-1 at 14. Nickels then met with Deb Brennan, the Vice Present of CCC, on May 3, 2016, to discuss concerns that the faculty had with CCC's administration.[2] Filing 118 at 224; Filing 140-6 at 1. At the meeting with Brennan, Nickels mentioned that Spanel was the Faculty Senate President, but did not tell Brennan which members of the faculty had complaints about CCC's administration. Filing 140-8 at 1; Filing 140-10 at 1. Brennan claims that Nickels never told her about the anonymous faculty survey and who organized it. Filing 118 at 225.

The next day, Brennan met with defendant Smith, who at the time served as the President of CCC, about her meeting with Nickels. Filing 143-31 at 16. Brennan informed Smith that the faculty had concerns with CCC's administration but did not mention any faculty names. Filing 143-31 at 16–17. Defendants deny ever learning of the anonymous survey or Spanel's involvement with surveying the faculty until Spanel filed an Equal Employment Opportunity Commission ("EEOC") discrimination charge against CCC in 2017. Filing 118 at 192-93, 200-01, 221–22, 224–25, 230. Spanel claims that since her involvement with the anonymous faculty survey she has been the subject of several retaliatory and discriminatory actions by Defendants from 2016 through 2020. These actions include two allegedly negative evaluations from Spanel's supervisors, Spanel's discipline after she failed to submit her schedule, CCC not promoting Spanel to Interim

---

[1] The dean at issue in these surveys is a nonparty.

[2] Nickels claims they also discussed concerns the faculty had with Human Resources and defendant Waddle, the Vice President of Human Resources at CCC, but Brennan does not recall discussing those issues. Filing 140-6 at 2; Filing 143-31 at 12. Brennan claims that she did not speak to defendant Waddle about her meeting with Nickels because no complaints against him had been brought forward. Filing 143-31 at 17.

Associate Dean of Academic Education, responses to Spanel's requests to accommodate her disability, and several other minor instances of alleged misconduct. Spanel also contends that the retaliation and discrimination continued in response to her filing two EEOC charges and this suit. However, Defendants are quick to point out that, since the anonymous faculty survey, Spanel has had her employment contract renewed several times, received raises, and eventually obtained tenured status. Filing 118 at 25, 41–42. The Court outlines the relevant episodes below.

### A. Associate Dean Kemp's 2016 Performance Evaluation and Cubicle-Moving Decision

On May 5, 2016, Spanel received an annual performance evaluation from her supervisor, Associate Dean of Academic Education Caroline Kemp. Filing 56 at 7, Filing 118 at 228. Although the evaluation contained several positive statements of Spanel's teaching ability, Kemp also wrote that she feared Spanel may be overextending herself and that Spanel failed to inform Kemp when another instructor covered her class. Filing 118 at 100–01. Spanel believes that this evaluation constituted the first negative review she has ever received in her professional career. Filing 118 at 101–02; Filing 143-1 at 22. Spanel attached a response to this evaluation in which she claimed that she felt that she was experiencing retaliatory behavior for her work with the Faculty Senate. Filing 118 at 102. Although an employee of CCC spoke to Spanel about these allegations of retaliatory behavior, Spanel declined to make a formal complaint or provide further details. Filing 118 at 32, 103.

A few days later, Spanel asked Kemp if she could move to a different cubicle. Filing 141-15 at 4–5. Spanel wanted to change from her smaller cubicle to a larger one. Filing 141-15 at 4–5. Kemp denied Spanel's request because CCC grouped faculty together based on their discipline and there were no open cubicles within Spanel's discipline area. Filing 141-15 at 4; Filing 143-2 at 10.

### B.  Bradley Keasling Becomes the Interim Associate Dean

In August of 2016, Associate Dean Kemp notified CCC that she was taking a leave of absence. Filing 143-28 at 16. The Dean of Academic Education and Kemp's supervisor, Kathy Fuchser, recommended Bradley Keasling to assume the role of Interim Associate Dean because Keasling had completed a return to industry the previous summer, had taught academic education courses in economics, and had expressed an interest in taking an administrative position. Filing 118 at 201; Filing 143-32 at 8–9. CCC did not post, advertise, or formally open the Interim Dean position for applications. Filing 118 at 201. Defendants claim that they did not consider Spanel for the position because she had never expressed interest in an administrative job and lacked administrative experience. Filing 118 at 201–02, 231; Filing 143-1 at 38 (Spanel stating that she never expressed interest in becoming an associate dean prior to August of 2016). CCC offered Keasling the position, and Keasling accepted. [3]

### C.  August 2016 Scheduling Issue and Discipline

On August 17, 2016, Spanel and the rest of the faculty in the Academic Education department received an email requesting that they turn in their weekly schedules. Filing 118 at 106. Spanel submitted her schedule, which included a fifteen-minute period between 7:45 AM and 8:00 AM for professional development. Filing 118 at 107. Dean Fuchser reviewed Spanel's schedule and requested that she adjust her fifteen-minute professional development period to a thirty-minute period because Fuchser wanted all schedules to have periods of at least thirty minutes for consistency purposes. Filing 118 at 109. Spanel emailed Fuchser explaining why she wanted a fifteen-minute rather than a thirty-minute period in the morning. Filing 118 at 112–13. Fuchser

---

[3] Spanel claims that CCC violated past practices in hiring Keasling as Interim Associate Dean of Academic Education. According to Spanel, in the past CCC offered associate dean positions to faculty within the department they would oversee, yet Keasling was not part of the Academic Education department when CCC promoted him. Filing 143-1 at 37.

5

responded by thanking Spanel for her explanation and again asked Spanel to submit a schedule with at least thirty-minute periods. Filing 118 at 111. Spanel refused to do so and told Fuchser that she was "continuing up the chain of command regarding [Fuchser's] request." Filing 118 at 116.

Spanel then sent an email about the scheduling issue to defendant Gotschall, who at the time was serving as CCC's Columbus Campus President and Vice President of Academic Education. Filing 118 at 122–23, 193. Gotschall agreed to meet with Spanel to address her concerns and told her to submit her schedule in the format required by Fuchser prior to the meeting. Filing 118 at 122. When Spanel again did not submit a revised schedule, defendant Smith, who was the President of CCC, emailed her and directed her to submit a revised schedule. Filing 118 at 128. After receiving Smith's email, Spanel submitted a revised schedule. Filing 118 at 39. The record does not show if Spanel had a meeting with Gotschall regarding the scheduling issue or, if she did, what occurred at the meeting.

Shortly thereafter, on August 30, 2016, Dean Fuchser issued a Performance Improvement Plan, a form of discipline at CCC, to Spanel for insubordination for failing to send a revised schedule as requested by her superiors. Filing 118 at 130, 232. CCC added the Performance Improvement Plan to Spanel's file but did not take further disciplinary action. Filing 118 at 41–43; Filing 143-8 at 1.

**D. Interim Associate Dean Keasling Chooses Which of Spanel's Conference Trips to Fund**

In March of 2016, Spanel asked then-Associate Dean Kemp, her supervisor, if she could attend one of two national conferences with the understanding that she could only receive funds to attend one of them. Filing 118 at 132–33. Kemp agreed to budget funds for Spanel to attend one of the two national conferences and that in the future Spanel could choose which one she wanted to attend. Filing 118 at 132. As mentioned above, Kemp later took a leave of absence and Interim

6

Associate Dean Keasling replaced her as Spanel's supervisor. Keasling was unaware that Kemp had told Spanel that Spanel could choose which conference she wanted to attend, and Spanel never definitively told him which conference she preferred. Filing 141-21 at 16; Filing 143-1 at 59. In September of 2016, Keasling decided to provide Spanel funds to attend the conference he believed was best for an English instructor to attend without obtaining her input about which conference she preferred to attend. Filing 141-21 at 15–16. Keasling informed Spanel that she could apply for funds to attend the other conference through the professional development fund. Filing 141-21 at 15–16.

### E.  Spanel's 2016 Request for a Disability Accommodation

On October 26, 2016, Spanel sent a disability-accommodation request to defendant Waddle, the Vice President of Human Resources at CCC. Filing 143-9 at 1. Waddle sent the request to Angela Davidson, a human resources generalist at CCC. Filing 141-8 at 2, 6–7. In the request, Spanel, who suffers from generalized anxiety disorder and posttraumatic stress disorder ("PTSD"), asked that CCC transfer her from her cubicle to an office with a door to help alleviate her symptoms. Filing 143-9 at 1–3. Although Spanel's request included a physician's note, Davidson asked Spanel for more documentation from a qualified physician who knew about Spanel's condition and what Spanel needed to accommodate it. Filing 144-22 at 2. The record does not show if Spanel provided this additional documentation.

Spanel, Davidson, and Interim Associate Dean Keasling met in November to review possible offices for Spanel. Filing 141-8 at 8. After the meeting, Davidson decided to place Spanel in a recording room with a door that was close to Spanel's colleagues. Filing 141-8 at 10; Filing 143-10 at 1–2. Unhappy with Davidson's decision, Spanel appealed the accommodation to defendant Waddle. Filing 143-11 at 3–8. Spanel believed that the recording room was too small to

be used as an office and had concerns about disabled students being able to use the door because of its narrowness. Filing 143-11 at 5–11. Spanel also took issue with Kemp, the Associate Dean of Academic Education who had taken a leave of absence in early 2016, being informed about her accommodation request and the nature of her disability. Filing 143-11 at 3–4. Spanel believed that the disclosure of her request and disability to Kemp violated the ADA. Filing 143-11 at 7.

On December 20, 2016, Waddle granted Spanel's appeal and agreed to transfer Spanel to a different office once that office's current occupant vacated it at the end of the semester. Filing 143-11 at 1. Waddle also explained that Kemp was informed of Spanel's accommodation request and disability because CCC was expecting Kemp to resume her position as Associate Dean of Academic Education in January of 2017 and believed she needed to know about Spanel's disability accommodation. Filing 143-11 at 1. Spanel moved into the office on January 5, 2017. Filing 118 at 204.

**F.  CCC Retains Keasling as the Interim Associate Dean of Academic Education**

On December 5, 2016, Kemp, the Associate Dean of Academic Education who had taken a leave of absence in early 2016, resigned. Filing 143-12 at 2. Because Kemp's supervisor, Dean Fuchser, was satisfied and impressed with Keasling's performance as interim Associate Dean, Fuchser decided to retain Keasling in an interim capacity through the spring 2017 semester. Filing 118 at 232–33.

**G.  CCC Hires Daniel O'Meara as Associate Dean of Academic Education in 2017 and Hires Dan Deffenbaugh as Associate Dean of Academic Education in 2018**

After the spring 2017 semester, CCC hired Daniel O'Meara as the permanent Associate Dean of Academic Education. Filing 143-1 at 82. Although CCC made the position available for applicants, Spanel never applied. Filing 143-1 at 82. One year later, in May of 2018, O'Meara

8

resigned. Filing 143-1 at 82. Again, Spanel did not apply for the position. Filing 143-1 at 86.

Spanel explains that she did not apply because she did not want to work in CCC's administration,

would lose her faculty union membership if she became an associate dean, and believed she would

not be hired since CCC did not give her the opportunity to become the Interim Associate Dean.

Filing 143-1 at 82, 86. CCC decided to hire Dan Deffenbaugh to replace O'Meara as Associate

Dean of Academic Education. Filing 143-27 at 4.

### H.  Spanel's 2017 Disability Accommodation Request

On June 30, 2017, Spanel submitted a second disability accommodation request to CCC's

Human Resources department. Filing 141-9 at 1. Spanel asked for several accommodations: (1)

that CCC provide Spanel with a private office; (2) a flexible schedule that included a four-day on-

campus work week and a daily start time after 9:00 AM; (3) that CCC permit her to teach "a

mixture of Web-based classes, hybrid, and lecture"; (4) that CCC ask Spanel about taking on an

overloaded schedule before assigning it; (5) a classroom with reduced "environmental/structural

triggers"; (6) that CCC allow Spanel to volunteer on committees; (7) that Dean Fuchser, defendant

Waddle, and human resources generalist Davidson only communicate with Spanel via email; and

(8) that a representative for Spanel be present at any meeting Spanel attended. Filing 141-9 at 2–

8. Davidson reviewed Spanel's accommodation request and responded on July 20, 2017. Filing

141-8 at 12; Filing 141-10 at 1–2. First, Davidson determined that Spanel's requests to limit

communication between her and Fuchser, defendant Waddle, and Davidson to email and to have

a personal representative at all her meetings were unreasonable. Filing 141-10 at 2. Second,

Davidson agreed that CCC would not assign Spanel an overloaded schedule without her

permission and that Spanel could volunteer on committees so long as it did not interfere with her

duties. Filing 141-10 at 1. Davidson then stated that CCC would strive to provide Spanel with a

flexible schedule and a classroom with reduced environmental and structural triggers. Filing 141-10 at 1. Finally, as to Spanel's request to teach "a mixture of Web-based classes, hybrid, and lecture," Davidson wrote that Spanel was "welcome to explore these options with her supervisor when future schedules [were] set."[4] Filing 141-10 at 1.

## I.   Spanel's 2018 and 2019 Disability Accommodation Requests and Spanel's Request to Teach a Class in a Hybrid Format

On August 9, 2018, Spanel made a third disability accommodation request. Filing 143-15 at 2. Spanel's requested accommodations mirrored the requests she made in 2017, and Davidson's responses to these requests on August 20, 2018, were virtually the same as the responses she gave in 2017. *Compare* Filing 141-9 at 1–8 (2017 accommodation request), *and* Filing 141-10 at 1–2 (response to 2017 accommodation request), *with* Filing 143-15 at 3–8 (2018 accommodation request), *and* Filing 144-31 at 5–6 (response to 2018 accommodation request). Davidson again explained that Spanel was welcome to explore teaching "a mixture of Web-based classes, hybrid, and lecture," with her supervisor and that CCC would strive to provide Spanel with a flexible schedule and a classroom with reduced environmental and structural triggers. Filing 144-31 at 5. Spanel appealed Davidson's decision, Filing 143-16 at 3, but nothing in the record details CCC's response. *See* Filing 143-2 at 6.

Beginning in the fall of 2018 and continuing into 2020, Spanel made requests to her supervisor, who was now Associate Dean Deffenbaugh, to teach one of her courses, ENGL 1040, Efficient Reading, in a hybrid format. Filing 118 at 255. A hybrid class is one taught both online and in person. Filing 118 at 255. While Spanel claims she made this request in connection with her disability-accommodation request, Filing 144-1 at 7, Defendants deny knowing that Spanel

---

[4] Davidson did not address Spanel's request for an office. Spanel had already moved into an office in January of 2016.

wanted to teach ENGL 1040 as a hybrid class to accommodate her disability. *See, e.g.*, Filing 143-27 at 9–10 (Deffenbaugh stating that he understood her accommodation included being able to teach classes in a variety of formats but that he recalled her specific request to teach a hybrid course to be for pedagogical purposes rather than for her accommodation); Filing 143-29 at 35 (Dean Clark stating that he did not understand Spanel's request to teach ENGL 1040 as a hybrid class to a be a disability accommodation). Deffenbaugh generally supported Spanel's request to teach ENGL 1040 as a hybrid class and emailed his supervisor, Dean Beverly Clark, about it. Filing 143-27 at 34–35. Dean Clark decided not to approve allowing Spanel to teach ENGL 1040 in a hybrid format. Filing 118 at 255–56.

On December 1, 2019, Spanel requested a disability accommodation for the 2019–2020 school year. Filing 141-8 at 18; Filing 141-12 at 1. Most of the accommodation requests were the same or similar to the ones she made in 2017 and 2018. *See* Filing 141-12 at 5–7. However, Spanel made three additional requests: that CCC allow her to bring her service dog to work; that CCC only require Spanel to work on campus if teaching an in-person class, conducting office hours, or attending meetings; and that CCC cap her workload at sixteen credit hours of instruction per semester. Filing 141-12 at 5–7.

In response, Davidson reiterated that CCC would strive to provide Spanel a flexible schedule and a classroom with reduced environmental and structural triggers. Filing 118 at 240. Davidson also told Spanel that she could discuss teaching "a mixture of Web-based classes, hybrid, and lecture" with her supervisor. Filing 118 at 240. However, Davidson rejected Spanel's three additional requests because they would interfere with Spanel's essential job functions and because the information Spanel provided with her accommodation request was insufficient to show that she needed a service dog. Filing 118 at 241.

Spanel appealed Davidson's decision to defendant Waddle on February 28, 2020. Filing 118 at 165. In her appeal, Spanel explained that she believed that Davidson's responses to several of her accommodation requests were inadequate because they did not require CCC to take any affirmative steps. Filing 118 at 166–68. For example, Spanel argued that Davidson stating that CCC would "strive" to allow Spanel to only work on campus four days a week did not require CCC to allow her to have a four-day on-campus workweek and was therefore inadequate. Filing 118 at 167. Most of Spanel's appeal focused on Spanel's desire to teach a "blended/hybrid modality." Filing 118 at 167–173. Specifically, Spanel asked that CCC allow her to teach a section of her ENGL 1040 class in a "hybrid/blended" fashion. Filing 118 at 172.

On April 28, 2020, Waddle sent an email to Spanel denying her appeal. Filing 118 at 216. In his email, Waddle explained that CCC's position was that Spanel was requesting to teach a mix of online, web-blended, and lecture formats to allow her to work from home as much as possible. Filing 118 at 216. To accommodate this request, CCC allowed Spanel to speak with her supervisor about teaching a mixture of modalities, and she was, in fact, currently teaching a mixture of modalities. Filing 118 at 216. As to Spanel asking in her appeal to teach her ENGL 1040 class in a hybrid format, Waddle stated that Spanel had not submitted this particular request to Davidson and that, before he could review this request, Spanel needed to ask Davidson about teaching a class in a hybrid format as an accommodation. Filing 118 at 216.

Spanel responded to Waddle in a March 19, 2020 email, stating that Waddle may have misunderstood her request to teach a hybrid class. Filing 118 at 219. Spanel explained that she wanted to teach one of her online ENGL 1040 courses as a hybrid class so that she could spend more time seeing students face-to-face. Filing 118 at 219. She also stated, without further explanation, that changing her online course to a hybrid one would accommodate her disability.

12

Filing 118 at 219. However, Spanel did not submit a separate accommodation request to Davidson to teach her online ENGL 1040 class in a hybrid format. Filing 118 at 205.

### J.  Actions by Defendant Gotschall in 2019 and 2020

On August 16, 2019, defendant Gotschall, who assumed the role of President at CCC in early 2018 after defendant Smith retired, met with CCC's faculty. Filing 56 at 34. Spanel claims Gotschall was rude to her and made false statements about her to the faculty during the meeting. Filing 143-2 at 19–20. Spanel further alleges that Gotschall was short and flippant with her after she asked him a question at another meeting in March of 2020. Filing 143-2 at 38.

In October of 2019, the faculty nominated Spanel for the Nebraska Community College Association ("NCCA") award. Filing 118 at 196; Filing 141-13 at 24. Gotschall claims he was confused by this announcement, as he understood that a member of CCC's administration was supposed to make the nomination. Filing 118 at 196. Eventually, CCC selected Spanel as its nominee for the NCCA award. Filing 118 at 196. However, the NCCA decided not to grant Spanel the award. Filing 118 at 196. After learning Spanel was not the award recipient, CCC declined to invite Spanel to attend the NCCA award reception. Filing 118 at 196. Defendants claim that it was CCC's practice to send NCCA award nominees to the reception only if they were going to receive the award. Filing 118 at 196–97.

Because Spanel was CCC's nominee for the NCCA award, she automatically became CCC's nominee for an American Association of Community College ("AACC") award. Filing 56 at 38–39. Gotschall claims that he inadvertently missed the deadline to submit Spanel as a nominee but was still able to nominate Spanel for the award. Filing 118 at 197. Thereafter, Spanel was recognized as CCC's 2019 AACC award recipient. Filing 118 at 197.

**K.  Spanel's 2020 Evaluation**

On April 21, 2020, Dan Deffenbaugh, Spanel's supervisor and the Associate Dean of Academic Education, provided Spanel a draft of his evaluation of her for the 2019–2020 academic year. Filing 118 at 174. By this time, Spanel had filed two EEOC complaints against CCC and this lawsuit against Defendants. In the evaluation, Deffenbaugh noted that Spanel was an excellent instructor, but worried that Spanel's representation of the faculty in the faculty union had taken an emotional toll on her and suggested that she redirect some of her energy toward student learning. Filing 118 at 175–76. Deffenbaugh also encouraged Spanel to take on new interests in CCC's community. Filing 118 at 177. Spanel responded to Deffenbaugh's evaluation by questioning if Deffenbaugh wrote certain comments because of her lawsuit against CCC. Filing 118 at 187. She also provided detailed comments responding to Deffenbaugh's statements in her evaluation. Filing 118 at 187–91. On May 6, 2020, Deffenbaugh provided Spanel with a final draft of his evaluation of her, to which Spanel gave her approval. Filing 118 at 261–62.

**L.  Procedural History of this Lawsuit**

On March 23, 2017, Spanel filed an EEOC charge of discrimination against CCC. Filing 143-13 at 1–4. In the filing, Spanel claimed that she "was subjected to acts of discrimination and retaliation due to [her] gender, disability, [her] record of a disability, or being regarded as disabled, and as acts of retaliation for engaging in protected activity." Filing 143-13 at 1. Spanel detailed that she had been involved in conducting an anonymous survey to gather faculty complaints against CCC's administration, and "[s]ince that time, CCC [had] subjected [Spanel] to retaliation[,] discrimination and harassment." Filing 143-13 at 2. The alleged retaliatory and discriminatory actions outlined in Spanel's charge were the performance evaluation issued by Associate Dean Kemp on May 5, 2016; CCC allegedly failing to promote her to the Interim Associate Dean of

Academic Education position; Dean Fuchser issuing Spanel a Performance Improvement Plan disciplinary form in August of 2016; Interim Associate Dean Keasling declining to fund Spanel's attendance of a national conference; and actions taken by CCC's Human Resources staff after Spanel requested to move into an office in October of 2016. Filing 143-13 at 2–3. The EEOC provided Spanel a Right to Sue notice on March 26, 2018. Filing 56 at 3. Spanel then filed suit in Nebraska state court which Defendants removed to this Court on August 10, 2018. Filing 1.

On May 4, 2020, Spanel filed a second charge of discrimination with the EEOC. Filing 56 at 3. In her charge, Spanel alleged that CCC failed to grant her disability accommodation requests; that CCC attempted to deny her the NCCA and AACC awards; and that Associate Dean Daniel Deffenbaugh told her to abdicate her role in the faculty union so she could take better care of her emotional health. Filing 143-14 at 1–2. The EEOC provided Spanel a Right to Sue notice for this charge on May 12, 2020. Filing 56 at 3.

A few months later, on August 26, 2020, Spanel filed her Third Amended Complaint. Filing 56. In her Complaint, Spanel brings a First Amendment retaliation claim against defendants Waddle, Gotschall, and Smith. Filing 56 at 60–61. As to defendant CCC, Spanel claims that CCC committed multiple violations of the ADA and the NFEPA, discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act and the NFEPA, and violated her Equal Protection and First Amendment rights. Filing 56 at 50–60. On November 24, 2021, Defendants filed a Motion for Summary Judgment. Filing 116. Defendants filed a Motion to Strike one of Spanel's exhibits on December 21, 2021, Filing 146, and Spanel moved for leave to file a surreply brief on December 23, 2021, Filing 149. Defendants filed a Motion to Exclude Testimony of Plaintiff's Expert on January 17, 2022. Filing 152.

### III.    ANALYSIS

### A.  Standard of Review

"Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Garrison v. ConAgra Foods Packaged Foods, LLC*, 833 F.3d 881, 884 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(c)). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). In reviewing a motion for summary judgment, the Court will view "the record in the light most favorable to the nonmoving party . . . drawing all reasonable inferences in that party's favor." *Whitney v. Guys, Inc.*, 826 F.3d 1074, 1076 (8th Cir. 2016) (citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 923–24 (8th Cir. 2004)). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except* the mere pleadings themselves." *Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 618 (8th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). The moving party need not produce evidence showing "an absence of a genuine issue of material fact." *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir. 2015) (citing *Celotex*, 477 U.S. at 323). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *St. Jude Med., Inc. v. Lifecare Int'l, Inc.*, 250 F.3d 587, 596 (8th Cir. 2001) (quoting *Celotex*, 477 U.S. at 325).

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs.*,

*Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Wagner v. Gallup, Inc.*, 788 F.3d 877, 882 (8th Cir. 2015) (quoting *Torgerson*, 643 F.3d at 1042). "[T]here must be more than 'the mere existence of *some* alleged factual dispute'" between the parties in order to overcome summary judgment. *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Vacca v. Viacom Broad. of Mo., Inc.*, 875 F.2d 1337, 1339 (8th Cir. 1989)).

## B.  Summary of the Order

Given the vast factual record and the number of claims in this case, the Court provides the following summary of this order: First, the Court determines that Spanel has failed to exhaust her administrative remedies as to her 2017 and 2018 requests for accommodation that were partially denied. The failure to exhaust precludes using those actions as a basis for Spanel's claims, except her hostile-work-environment claim. The Court then determines that Spanel has not shown direct evidence of discrimination, and therefore must proceed under the *McDonnell Douglas* framework for her Title VII sex discrimination and retaliation claims; her NFEPA sex discrimination, disability discrimination, and retaliation claims; her ADA disability discrimination claim; her Equal Protection claim; and her First Amendment retaliation claim.

Next, the Court determines that Spanel's Title VII and NFEPA retaliation claims fail because Spanel has not shown she suffered a materially adverse employment action or that Defendants' reasons for their actions are pretextual. The Court likewise dismisses Spanel's Title VII sex discrimination claim, her NFEPA sex and disability discrimination claims, her Equal Protection claim, and her First Amendment retaliation claim for failing to show an adverse

17

employment action or establish pretext. The Court then concludes that Spanel's hostile-work-environment claims fail because she has not demonstrated that she suffered severe and pervasive harassment. Afterwards, the Court dismisses her supervisory-liability claim because she has not shown an underlying violation of her First Amendment rights. Finally, the Court concludes that Spanel's ADA and NFEPA failure-to-accommodate claims fail. Accordingly, the Court grants Defendants' Motion for Summary Judgment.

### C.  Failure to Exhaust

The Court first addresses Spanel's failure to exhaust her administrative remedies. Spanel filed her first EEOC charge on March 23, 2017, Filing 143-13 at 1–4, and her second one on May 4, 2020, Filing 56 at 3. Defendants argue that any claims of discrimination occurring after her first EEOC charge and over 300 days before her second EEOC charge have not been properly exhausted. The Court agrees.

To bring an action under the ADA or Title VII "a party must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter." *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630 (8th Cir. 2000). The NFEPA has a similar requirement, except that charges must be filed with the Nebraska Equal Opportunity Commission ("NEOC"). *See* Neb. Rev. Stat. § 48-1118 (requiring exhaustion of NFEPA claims). A plaintiff must file a charge of discrimination within 300 days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1); *Brown v. Reg'l W. Med. Ctr.*, 916 N.W.2d 590, 596 (Neb. 2018) ("Under . . . the NFEPA, a claim must be filed with . . . the NEOC within 300 days after the occurrence of the alleged unlawful employment practice."). "The proper exhaustion of administrative remedies gives the plaintiff a green light to bring [his or] her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court." *Parisi v. Boeing Co.*, 400 F.3d 583, 585 (8th

Cir. 2005) (alteration in original) (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996)).

The two acts of alleged discrimination and retaliation that occurred between Spanel's first EEOC charge and 300 days before her second charge are the two denials of some of her accommodation requests: one on July 20, 2017, and one on August 20, 2018. Filing 144-31 at 1–2; Filing 141-19 at 1–2. Spanel has not exhausted her administrative remedies as to these two alleged acts of discrimination and retaliation. Therefore, Spanel may not use them to support her claims of discrimination and retaliation under Title VII, the ADA, the NFEPA, or the First Amendment.[5]

Spanel attempts to resist this conclusion by arguing that her 2017 EEOC charge outlined a "continuing violation" and it therefore encompasses all subsequent acts of discrimination by Defendants. Filing 139 at 38–40. However, the denial of an accommodation request is a discrete adverse employment action that must be administratively exhausted. *See Quasius v. Schwan Food Co.*, No. CIV. 08-575 (JNEJJG), 2008 WL 4933764, at *5 (D. Minn. Nov. 14, 2008) (concluding that denial of a request for an accommodation is a discrete adverse employment action) (citing *Cherosky v. Henderson*, 330 F.3d 1243, 1248 (9th Cir. 2003) and *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134–35 (2d Cir. 2003)); *Brown v. Reg'l W. Med. Ctr.*, 916 N.W.2d 590, 597 (Neb. 2018) (holding that the continuing-violation doctrine did not apply to a reasonable-accommodation claim because failing to accommodate a disability is a discrete act); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (stating that an employee must file an

---

[5] Spanel may, however, use the denial of some of her accommodation requests in 2017 and 2018 for her hostile-work-environment claim. *See Morgan*, 536 U.S. at 117 (holding that a hostile-work-environment claim is properly exhausted if one act that contributed to the claim occurs within the time limit to file a charge). As explained below, however, this detail does not save Spanel's hostile-work-environment claim because even considering the denial of some of her 2017 and 2018 accommodation requests Spanel cannot show that the alleged unlawful acts were severe and pervasive enough to constitute a hostile work environment.

EEOC charge within 300 days of a discrete discriminatory act). It is true that a plaintiff may administratively exhaust subsequent acts of discrimination when they are "like or reasonably related" to the properly exhausted claims. *Wedow v. City of Kan. City*, 442 F.3d 661, 672 (8th Cir. 2006). But the Eighth Circuit has a narrow view of what is considered "like or reasonably related." *Id.* For example, in *Parisi v. Boeing Co.*, the plaintiff claimed the defendant discriminated against him by refusing to hire him several times, but only outlined the refusal to hire him on January 12, 2001, in his EEOC charge. *Parisi*, 400 F.3d at 584–85. The Eighth Circuit held that the plaintiff failed to exhaust any claims that the defendant refused to rehire him that occurred after January 12, 2001. *Id.* at 585–86.

The result in *Parisi* governs this case. In her 2017 EEOC charge, Spanel alleged that Defendants failed to accommodate her request to move into an office in 2016. Filing 143-13 at 1–4. The alleged failure to accommodate in 2016 "constitutes a completed act at the time it occurred." *Id.* at 586 (quoting *Boge v. Ringland-Johnson-Crowley Co.*, 976 F.2d 448, 451 (8th Cir. 1992)). Therefore, her 2017 and 2018 requests for accommodation are not "like or reasonably related" to the allegations made in Spanel's 2017 EEOC charge and have not been administratively exhausted.

**D.  Spanel's Title VII Sex Discrimination and Retaliation Claims; NFEPA Sex Discrimination, Disability Discrimination, and Retaliation Claims; ADA Disability Discrimination Claim; Equal Protection Claim; and First Amendment Retaliation Claim**

In her Third Amended Complaint, Spanel alleges that Defendants have engaged in a four-year campaign to discriminate and retaliate against her after her involvement with the anonymous faculty survey that raised complaints against CCC's administration. *See generally* Filing 56. Specifically, Spanel claims that Defendants have discriminated against her on the basis of her sex

and disability in violation of Title VII, the NFEPA, the ADA, and the Equal Protection Clause of the Fourteenth Amendment, and retaliated against her in violation of Title VII, the NFEPA, and the First Amendment. Filing 56 at 50–61. Defendants argue that all of these claims must fail because Spanel has not suffered an adverse employment action, which is a necessary element of her discrimination and retaliation claims. Filing 117 at 21–22. Alternatively, Defendants argue that Spanel has failed to show that their reasons for taking the alleged discriminatory and retaliatory actions against Spanel are pretextual. Filing 117 at 33–34. In response, Spanel contends that "[t]he numerous and on-going discriminatory retaliatory events that make up [Defendants'] unlawful employment practice over the course of several years" are sufficient to show that she has suffered an adverse employment action. Filing 139 at 32. Spanel further argues that she has provided enough evidence from which a reasonable jury could find that Defendants' explanations are a pretext for discrimination. Filing 139 at 32–36. The Court concludes that the evidence does not show an adverse employment action and, even if it did, Spanel does not provide sufficient evidence that Defendants' reasons for their actions are pretextual. Therefore, Defendants are entitled to Summary Judgment on Spanel's Title VII sex discrimination and retaliation claims; her NFEPA sex discrimination, disability discrimination, and retaliation claims; her ADA disability discrimination claim;[6] her Equal Protection claim; and her First Amendment retaliation claim.

1. *Spanel's Discrimination and Retaliation Claims Must be Analyzed Under the McDonnell Douglas Burden-Shifting Framework*

Spanel generally claims that Defendants have discriminated and retaliated against her in violation of the ADA, the NFEPA, Title VII, the Equal Protection Clause, and the First Amendment. *See generally* Filing 56. To prevail on these claims, Spanel must provide "either

---

[6] Although failure-to-accommodate is a form of disability discrimination, the Court addresses that claim in a separate section because it requires a different analysis.

direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse-action was in retaliation for the protected conduct." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (quoting *Young-Losee*, 631 F.3d at 912). "It most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 797 n.3 (8th Cir. 2021) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009)).

Spanel points to three utterances by Defendants that she claims constitute direct evidence of discrimination and retaliation: Defendant Smith stating that if the faculty were not unionized they could leave earlier for Christmas Break, Filing 141-27 at 20; defendant Waddle telling a faculty member that the faculty member's "First Amendment Rights end once you walk on Campus," Filing 140-15 at 1; and Waddle allegedly telling Kemp, Spanel's supervisor, that he "wanted [Spanel's] job," Filing 144-1 at 3. These statements are not "sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Kerns v. Cap. Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999). Although Spanel characterizes Smith's comment as expressing anti-union sentiment, as Smith explained in his deposition, he made the comment about the faculty union as a way to explain why the negotiated agreement between the union and CCC's administration required them to work a certain number of days. Filing 141-27 at 20. Spanel does not provide evidence that this explanation is untruthful or that Smith's original comment expressed a retaliatory or discriminatory attitude against Spanel. Moreover, Waddle made his statement about the First Amendment in the context of telling an

22

employee to remove an inappropriate joke on his computer screen. Filing 140-15 at 1. Therefore, Waddle's statement had nothing to do with Spanel. Finally, not only does Spanel fail to provide any evidence that Waddle told Kemp that he wanted Spanel's job,[7] such a statement does not reflect that Waddle had a discriminatory bias or a retaliatory animus.

Because there is no direct evidence of discrimination, the Court analyzes her retaliation and discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See DePriest v. Milligan*, 823 F.3d 1179, 1187 (8th Cir. 2016) ("We analyze First Amendment . . . retaliation claims under the same framework as claims of retaliation under Title VII."); *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007) ("Without direct evidence of a retaliatory motive, we analyze retaliation claims (whether under Title VII, the ADA, or the ADEA), under the burden-shifting framework of [*McDonnel Douglas*].");  *Hager v. Ark. Dep't of Health*, 735 F.3d 1009, 1014 (8th Cir. 2013) ("Absent evidence of direct discrimination, courts apply the *McDonnell Douglas* burden-shifting analysis to claims of employment discrimination under the Equal Protection Clause."); *Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999) ("This court has adopted [the *McDonnell Douglas* framework] for purposes of construing the NFEPA."). To prove a case for discrimination under this framework, Spanel must first show that "(1) she belongs to a protected group; (2) she was qualified for her former job; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." *Warmington*, 998 F.3d at 797. Similarly, for her retaliation claims Spanel must prove that she engaged in protected conduct, she

---

[7] Spanel allegedly heard about Waddle's statement from an employee who claimed he heard from other employees that Waddle told Kemp that Waddle wanted Spanel's job. Filing 140-19 at 2. Thus, Spanel's evidence of Waddle's statement is barred by multiple levels of hearsay. *See Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) ("[I]inadmissible hearsay evidence cannot be used to defeat summary judgment." (citing *Brooks v. Tri– Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005))). Moreover, Kemp has denied that Waddle ever made such a statement and thus such evidence is not undisputed for purposes of summary judgment. Filing 143-28 at 14.

suffered an adverse employment action, and a causal connection between the protected activity and the adverse employment action exists. *See DePriest*, 823 F.3d at 1187 (listing elements for analyzing both Title VII and First Amendment retaliation claims). If Spanel makes this prima facie showing, Defendants must counter Spanel's prima facie case with evidence of a legitimate, non-retaliatory and non-discriminatory reason for the action they took against Spanel. *See E.E.O.C. v. Kohler Co.*, 335 F.3d 766, 773 (8th Cir. 2003) (providing the legal standard for pretext). The burden then shifts back to Spanel to establish that Defendants' reason is pretextual and that illegal retaliation or discrimination was the motivating reason for Defendants' decision. *See id.*

### 2. *Spanel's Title VII and NFEPA Retaliation Claims*

The Court starts with Spanel's Title VII and NFEPA retaliation claims. According to Spanel, Defendants[8] retaliated against her for her involvement in the anonymous faculty survey. *See generally* Filing 56; Filing 139 at 19. Defendants have argued that Spanel's claim fails because she has not suffered an adverse employment action and, even if she did, she has not demonstrated that Defendants' explanations for their actions are pretextual. The Court concludes that Defendants are entitled to summary judgment on Spanel's Title VII and NFEPA retaliation claims.

The Court analyzes Spanel's Title VII and NFEPA claims together. *See Knapp v. Ruser*, 901 N.W.2d 31, 43 (Neb. 2017) ("[T]he NFEPA is patterned after federal Title VII and that it is appropriate to look to federal court decisions construing Title VII for guidance with respect to the NFEPA."). In the Title VII and NFEPA retaliation context, an adverse employment action is one that is "materially adverse." *Ellis v. Houston*, 742 F.3d 307, 323 (8th Cir. 2014); *Knapp*, 901 N.W.2d at 48 ("To satisfy the 'adverse employment action' requirement in a retaliation claim, a plaintiff must show that 'a reasonable employee would have found the challenged action materially

---

[8] Although Spanel's Title VII claim is only brought against CCC, for the purposes of clarity the Court will refer to Defendants when analyzing her claim as Defendants submitted joint briefing on all issues.

adverse . . . .'" (citation omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))). Under this standard, to prove that Defendants took an adverse employment action against her, Spanel must show that Defendants' actions "result[ed] in some 'injury or harm' that would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (second alteration in original) (quoting *Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009)). "[T]o be materially adverse, retaliation cannot be trivial; it must produce some injury or harm." *Littleton*, 568 F.3d at 644. "Reporting discriminatory behavior 'cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014) (quoting *White*, 548 U.S. at 68). Whether an action is "materially adverse" is a "flexible standard" that "often depends upon the particular circumstances." *Id.* Finally, Spanel's subjective interpretation of Defendants' actions is not determinative; rather, whether an action is materially adverse is an objective test. *See Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1081 (8th Cir. 2010) ("[The plaintiff's] subjective view is not determinative. Objectively viewed, [the supervisor's] statement is not a warning or a threat."). The Court proceeds to examine the incidents Spanel claims constitute materially adverse employment actions for her Title VII and NFEPA retaliation claims under the *McDonnell Douglas* framework in turn.

a.   Spanel's 2016 and 2020 Employment Evaluations

Spanel argues that her 2016 and 2020 employment evaluations were "negative," "untrue," and done for the purpose of retaliating against her for helping bring faculty complaints against CCC's administration. Filing 139 at 19, 32–33. Spanel's characterization of the evaluations as "negative" and "untrue" appears overstated as both evaluations highly praise Spanel's teaching abilities while also providing constructive criticism. Nevertheless, even if they are construed as

25

negative reviews, Spanel suffered no consequences from them. Instead, Spanel had her employment contract renewed, received raises, and eventually obtained tenured status. Filing 118 at 25, 41–42. "A lower satisfactory evaluation, by itself, does not provide a material alteration of [Spanel's] employment and is not actionable." *Sutherland v. Mo. Dep't of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009). Thus, Spanel's 2016 and 2020 evaluations are not materially adverse. *See Ellis*, 742 F.3d at 323 (noting that "two allegedly false and unfair reports of misconduct with no significant consequence" do not establish retaliation).

b.   Spanel's 2016 Discipline

The Performance Improvement Plan for insubordination that Spanel received was also not a materially adverse employment action. Spanel received the Performance Improvement Plan for refusing to submit her schedule in the format required by Dean Fuchser, the supervisor of Spanel's direct supervisor. Instead, Spanel told Fuchser that she was "continuing up the chain of command" and brought the issue to defendant Gotschall, who was CCC's Columbus Campus President at the time. Not until defendant Smith, the President of CCC, got involved did Spanel finally turn in her schedule. After this episode, Spanel received a Performance Improvement Plan for insubordination.

"[A] reprimand constitutes an adverse employment action 'only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse.'" *Charleston v. McCarthy*, 926 F.3d 982, 990 (8th Cir. 2019) (quoting *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015)). Spanel has provided no evidence that her Performance Improvement Plan affected her employment in any way. Indeed, as mentioned above, Spanel has consistently received raises, has had her employment contract renewed, and received tenure. Being justifiably reprimanded for misbehavior without any consequences would not deter a reasonable employee from engaging in

26

protected conduct. Therefore, the Performance Improvement Plan was not a materially adverse employment action.

c.   The Failure to Promote Spanel to the Interim Associate Dean Position

Spanel next contends that Defendants' failure to promote her to the Interim Associate Dean position in 2016 constitutes a materially adverse employment action. Filing 139 at 35–36. Failing to promote an employee can be a materially adverse employment action. *AuBuchon*, 743 F.3d at 643 ("Unquestionably, failure to promote can constitute an adverse employment action that would support a plaintiff's retaliation claim."). But even assuming Spanel shows material adversity, she does not establish pretext. The record shows that when Kemp, the then-current Associate Dean of Academic Education, took a sudden leave of absence in August of 2016, Fuchser, the Dean of Academic Education, had to quickly decide who to select as the Interim Associate Dean for the Fall 2016 semester. *See* Filing 143-32 at 9. Fuchser explained that she recommended Keasling to assume the role of interim dean because she believed he was the best candidate and had expressed interest in an administrative position. Filing 118 at 230; Filing 143-32 at 9. Spanel had not expressed an interest in an administrative position when CCC selected Keasling to fill the role of Interim Associate Dean. Filing 118 at 201–02; Filing 143-1 at 38. Additionally, Spanel stated during her deposition that she would not accept a position with CCC's administration if they offered it today because she is afraid of losing the protection of the faculty union. Filing 143-1 at 7.

Even assuming that deciding not to promote Spanel to a position in which she never expressed interest is a materially adverse employment action, Spanel fails to show that Fuchser's reasons to select Keasling instead of her are pretextual. A plaintiff may show pretext by demonstrating that "the employer's explanation is unworthy of credence because it has no basis in

fact . . . . [or] by persuading the court that a prohibited reason—more than the proffered reason—likely motivated the employer." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 988 (8th Cir. 2011). In order to succeed, Spanel must discredit Defendants' asserted reasons for failing to promote her and "show that the circumstances permit drawing a reasonable inference that the real reason for [failing to promote her] was retaliation." *Hutton v. Maynard*, 812 F.3d 679, 684 (8th Cir. 2016). "Evidence of pretext and retaliation 'is viewed in light of the employer's justification.'" *Id.* at 684–85 (quoting *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005)). "The burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence." *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 705 (8th Cir. 2005) (quoting *Floyd v. State of Mo. Dep't of Soc. Servs., Div. of Fam. Servs.*, 188 F.3d 932, 936 (8th Cir. 1999)).

Spanel has not provided sufficient evidence that would permit drawing a reasonable inference that Fuchser failed to promote her to retaliate against her. The record shows that Fuchser needed to quickly select an Interim Associate Dean and chose who she believed to be the best candidate who had expressed an interest in an administrative position. Filing 143-32 at 8–9; Filing 141-27 at 29 (defendant Smith stating that, to select an Interim Associate Dean, Fuchser would perform "due diligence" and make a recommendation to him about who should be chosen). Fuchser stated that she believed Keasling should be selected because he had completed a "return to industry," had taught academic education courses in economics, and had expressed an interest in doing administrative work. Filing 143-32 at 9. In contrast, Fuchser had no reason to consider Spanel because she had never expressed interest in serving as the Interim Associate Dean.[9] Filing

---

[9] Before August of 2016, Kemp asked Spanel if she was interested in administrative work and said that Spanel would be good at it. Filing 143-1 at 38. Spanel replied, "Thank you," but did not state that she was interested. Filing 143-1 at 28.

118 at 231; Filing 143-1 at 38. Indeed, Defendants have averred that nobody even discussed Spanel as a candidate for the Interim Associate Dean position. Filing 118 at 220, 231. Additionally, Fuchser was unaware of the anonymous survey of faculty complaints that Spanel organized, Filing 118 at 230, meaning that her decision not to consider Spanel could not have been in response to the anonymous faculty survey. Finally, there is no evidence that Keasling was unqualified for the Interim Associate Dean position. *See Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (noting, while addressing a failure-to-promote claim, that there was "no evidence that the persons selected were not qualified for the job"). These circumstances do not support an inference that Fuchser is using these explanations to cloak an underlying retaliatory motive.

Spanel attempts to show pretext by arguing that CCC usually selects interim associate deans from within the department that the interim associate dean will supervise. Filing 139 at 6; Filing 143-1 at 37; Filing 143-22 at 54. Because Keasling was not working in the Academic Education Department at the time Defendants selected him as the Interim Associate Dean of Academic Education, Spanel argues that CCC violated its past practice and thus their stated reasons for selecting Keasling were pretextual. The Court finds this argument unpersuasive. *Cf. Schaffhauser*, 794 F.3d at 904 ("Although an employer's violation of its own policies may be indicative of pretext, that is not always so." (quoting *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010))). First, Keasling had, sometime before his appointment, taught in the Academic Education department. Filing 141-27 at 29. Thus, Fuchser's selection of someone with a past connection to the department was not wholly out of step with CCC's past practice. Moreover, Spanel has not shown that the reasons Fuchser recommended Keasling have no basis in fact, provided evidence that Fuchser was aware of her involvement with the anonymous faculty survey, or demonstrated that Keasling was clearly less qualified than her. *See Torgerson v. City of*

29

*Rochester*, 643 F.3d 1031, 1048 (8th Cir. 2011) (noting that a plaintiff can show pretext if the promoted candidate was clearly less qualified than the plaintiff). The Court finds that the other instances of CCC selecting interim associate deans from within the departments they would supervise do not establish pretext. *See Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (quoting *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995)).

For similar reasons, Spanel has not demonstrated that Defendants' stated reasons for retaining Keasling as the Interim Associate Dean for the spring 2017 semester were pretextual. When Kemp suddenly resigned from her position as Associate Dean of Academic Education on December 5, 2016, Fuchser looked to Keasling who she believed had performed satisfactorily as the Interim Associate Dean during the fall 2016 semester. Filing 118 at 232–33; Filing 143-12 at 2. Again, there is no evidence that Spanel informed Fuchser that she was interested in an administrative position or that Defendants ever considered her. *See, e.g.*, Filing 143-1 at 76 (Spanel stating that she did not tell Smith she was interested in the Interim Associate Dean position at a December 9, 2016 meeting); Filing 118 at 233. Nor is there any evidence that, at this point, Fuchser was aware of Spanel's involvement with the anonymous faculty survey. The record does not provide a sufficient basis to conclude that Defendants' reasons for retaining Keasling were pretextual. Moreover, given that Keasling was already serving as the Interim Associate Dean when Kemp resigned and Defendants merely retained him, the Interim Associate Dean position never actually opened. *Moore v. Forrest City Sch. Dist.*, 524 F.3d 879, 885 (8th Cir. 2008) (holding that the plaintiff's failure-to-promote claim failed because there was no position available to which to

promote her). On these facts the Court concludes that Spanel has failed to establish pretext as to her failure-to-promote claim.

Finally, to the extent Spanel argues that CCC's failure to promote her to the permanent Associate Dean of Academic Education position is materially adverse, the record shows she never applied for the position. When an employer officially posts the availability of a position, a plaintiff can only support a failure-to-promote claim if she "made every reasonable attempt to convey [her] interest in the job to the employer." *Chambers v. Wynne Sch. Dist.*, 909 F.2d 1214, 1217 (8th Cir. 1990). Spanel's lack of a formal application is fatal to any claim she makes that CCC's failure to promote her to the permanent Associate Dean position was a materially adverse employment action. *E.E.O.C. v. Audrain Health Care, Inc.*, 756 F.3d 1083, 1087 (8th Cir. 2014) (holding that the plaintiff's failure-to-promote claim failed when the plaintiff did not apply for the position).

> d. Kemp Denying Spanel's Request to Move Cubicles, Keasling's Decision on Which Conference Trip to Fund, Gotschall's Statements, and the Award Nomination Process

Spanel also argues that a variety of Defendants' other actions were materially adverse. Filing 139 at 30–31. These actions include Associate Dean Kemp's denial of Spanel's request to move cubicles, Associate Dean Keasling's decision on which of Spanel's conference trips to fund, statements defendant Gotschall made during two meetings, and the process by which CCC nominated Spanel for two awards. None of these actions rise to the level of a materially adverse employment action. As the Eighth Circuit has explained, "Minor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Wagner v. Campbell*, 779 F.3d 761, 766–67 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Clegg v. Ark. Dep't*

*of Corr.*, 496 F.3d 922, 926 (8th Cir. 2007)). "Petty slights and minor annoyances in the workplace, as well as personality conflicts and snubs by co-workers, are not actionable." *Sutherland*, 580 F.3d at 752. The Eighth Circuit has held that several employer actions are not materially adverse because they did not cause sufficient "injury or harm" to the employee. *See Recio v. Creighton Univ.*, 521 F.3d 934, 939–40 (8th Cir. 2008) (holding that extending the duration of employer-mandated counseling, failing to notify the plaintiff of a job vacancy, changing the plaintiff's work schedule, denying the plaintiff an opportunity to teach certain classes, and keeping office temperature cold are not materially adverse); *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 917 (8th Cir. 2007) (holding that preventing the plaintiff's preferred guest speaker and assigning him to an open cubicle were not materially adverse); *Clegg*, 496 F.3d at 929 (failing to provide training and orientation, exclusion from meetings, and denying access to work tools were not materially adverse employment actions).

The actions that Spanel contends are materially adverse are the types of petty slights and minor annoyances that the Eighth Circuit has held to be unactionable. Spanel has failed to show that any of Defendants' actions caused sufficient harm to her. Kemp's denial of Spanel's request to move to a different cubicle, which forced Spanel to continue working in a smaller cubicle, is a "mere inconvenience" that, at most, "result[ed] only in minor changes in working conditions." *Wedow*, 442 F.3d at 671 (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005)). Similarly, two allegedly rude statements and choosing which of Spanel's conference trips to fund without her input are trivial rather than material. *See White*, 548 U.S. at 68 (emphasizing that material adversity requires significant rather than "trivial harms"). While treating all employees respectfully is ideal, and perhaps Keasling could have sought out Spanel's input before choosing which conference trip to fund, "Title VII does not promulgate a 'civility code for the American

workplace.'" *AuBuchon*, 743 F.3d at 644 (quoting *White*, 548 U.S. at 68). Finally, Defendants deciding not to send Spanel to the NCCA award reception and defendant Gotschall's delay in nominating Spanel for the AACC award may have upset Spanel, but "not everything that makes an employee unhappy is an actionable adverse action." *Sellers v. Deere & Co.*, 791 F.3d 938, 942 (8th Cir. 2015). The Court concludes that these actions were not materially adverse.

e.   The Responses to Spanel's 2016 Accommodation Request

Finally, Spanel points to the responses Defendants made to her accommodation requests as examples of Defendants taking materially adverse employment actions against her. Filing 139 at 30–31. Spanel has made yearly accommodation requests since 2016 to accommodate her generalized anxiety disorder and PTSD. On October 26, 2016, Spanel requested that CCC transfer her from a cubicle to an office to help her manage her anxiety disorder. Filing 143-9 at 1–3. Davidson, an HR generalist at CCC, asked Spanel to provide her more documentation from a qualified physician. Filing 144-22 at 2. Later, Davidson placed Spanel in a recording room that was near her colleagues. Filing 141-8 at 10; Filing 143-10 at 1–2. Spanel appealed Davidson's decision to defendant Waddle, the Vice President of Human Resources at CCC, stating that she had concerns about the recording room being too small and that some disabled students may not be able to fit through the narrow door to the recording room. Filing 143-11 at 3–11. Spanel also took issue with Associate Dean Kemp, who at the time was on a leave of absence, being informed of her accommodation request and the nature of her disability. Filing 143-11 at 3–4.

On December 20, 2016, Waddle granted Spanel's appeal and agreed to transfer her to a different office once that office's current occupant vacated it at the end of the semester. Filing 143-11 at 1. Waddle also explained that CCC informed Kemp about Spanel's accommodation request because CCC expected Kemp to resume her duties as associate dean in January of 2017 and thus

33

needed to know about Spanel's disability accommodation. Filing 143-11 at 1. On January 5, 2017, Spanel moved into her new office. Filing 144-1 at 5.

Spanel argues that Davidson requiring additional documentation, the initial decision to place her in a recording room, Kemp being informed about her accommodation request, and the delay between granting her request and moving her into her office are materially adverse. But Spanel provides no evidence explaining how any of these actions caused her significant, rather than trivial, harm. Instead, by the end of this process, CCC provided Spanel an office when before she had to work at a cubicle. *See Fercello*, 612 F.3d at 1078 (finding that changing the plaintiff's parking space was not materially adverse because the plaintiff receiving a parking spot "was a benefit beyond what she received prior to reporting [her supervisor's] harassment"). Moreover, given that Kemp was planning on returning as Spanel's supervisor after her leave of absence, Spanel fails to show that Defendants unlawfully disclosed her medical information to Kemp. *See* 42 U.S.C. § 12112(d)(3)(B)(i) (stating that supervisors may be informed of an employee's accommodations). The Court concludes that Defendants' responses to Spanel's 2016 accommodation request are not materially adverse.[10]

### f.   The Responses to Spanel's 2019 Accommodation Request

From 2017 through 2019, Spanel made further requests to accommodate her anxiety disorder and her PTSD. As previously explained, Spanel did not exhaust her administrative remedies for her 2017 and 2018 accommodation requests, so only her 2019 accommodation request is actionable. In her 2019 accommodation request, Spanel asked that the following

---

[10] Even if Defendants' actions in response to Spanel's 2016 accommodation request could somehow be characterized as materially adverse, Spanel has failed to show that any of the explanations for their actions are pretextual. For example, Defendants explained that they shared Spanel's request with Associate Dean Kemp because they anticipated her returning to work and would need to know about Spanel's accommodation. Spanel has not demonstrated that this explanation is pretextual.

accommodations continue: her private office space; CCC striving to give her a shortened on-campus workweek; CCC striving to avoid assigning her classes starting at 9:00 AM; CCC striving to provide Spanel a classroom with reduced environmental and structural triggers; CCC allowing Spanel to volunteer on committees; and CCC refraining from assigning Spanel an overloaded schedule without her permission. Filing 118 at 161. Spanel also made the following additional requests: (1) allowing her to work from home when not teaching in-person classes, conducting office hours, or attending required meetings; (2) allowing her to bring her service dog to work as needed; (3) allowing her to "teach a mix of online, web-blended, and lecture courses each semester;" (4) capping her workload at sixteen instructional units per semester; and (5) limiting all communication between Spanel and Fuchser, Waddle, and Davidson to email, WebEx meeting, or in-person as long as Spanel received at least twenty-four hours' notice and was allowed to bring her service dog or a personal representative. Filing 118 at 161–63.

Davidson responded to these requests, finding that Spanel's request to work from home unless teaching in-person classes, conducting office hours, or attending meetings; her request to cap her workload at sixteen instructional units per semester; and her request to limit the way she communicated with Fuchser, Waddle, and Davidson were unreasonable because they eliminated essential functions of her job. Filing 118 at 241. Davidson explained that the essential functions of Spanel's job included being on campus at least thirty hours per week, working between fifteen to eighteen instructional units per semester, and interacting with CCC's personnel, management, and students in a variety of modalities. Filing 118 at 241–42. As to Spanel's request to bring her service dog as needed, Davidson explained that Spanel had not provided sufficient information to her about the necessity of the dog for Spanel to perform her job. Filing 118 at 241. Davidson concluded by stating that Spanel could explore available options to teach a mixture of class modalities with

her supervisor. Filing 118 at 241. Spanel appealed Davidson's decision to defendant Waddle, complaining that CCC stating it would "strive" to provide certain accommodations to her did not bind it to do anything, and stating that she wanted to teach an online section of her ENGL 1040 course as a hybrid. Filing 118 at 166–173, 216. Waddle denied her appeal, stating that Spanel's request to teach ENGL 1040 as a hybrid needed to go to Davidson first. Filing 118 at 216. Spanel did not submit this request to Davidson. Filing 118 at 205.

The Court concludes that Davidson's response to Spanel's requests were not materially adverse.[11] First, the Court disagrees with Spanel's characterization of CCC's agreement to "strive" to provide some of her requests as a denial of her accommodations. Here, Spanel has not provided any evidence that CCC did not, in fact, give her a shortened on-campus workweek, keep her from teaching classes that began at 9:00 AM, or provide her a classroom with reduced environmental and structural triggers. Indeed, in her September 6, 2018 accommodation-request appeal, Spanel acknowledged that CCC was allowing her to work four days on campus and one day at home. Filing 143-16 at 6. Moreover, the fact that her 2019 request characterizes these requests as "accommodations to continue" infers that CCC was already, in practice, providing Spanel with these accommodations. Thus, at best for Spanel's case, the record is silent on whether CCC has made good on its promise to "strive for" providing these accommodations. *See* Torgerson, 643 F.3d at 1042 (noting that a nonmovant must point to "specific facts showing that there is a genuine issue for trial" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

[11] While a failure to provide accommodations may support the adverse employment action requirement of a failure-to-accommodate claim, Spanel must still show a materially adverse employment action for her Title VII and NFEPA retaliation claims. *See* Peebles v. Potter, 354 F.3d 761, 766 (8th Cir. 2004) ("The failure to make reasonable accommodations in the employment of a disabled employee is a separate form of prohibited discrimination."); Knapp, 901 N.W.2d at 48 (requiring material adversity in NFEPA discrimination case).

(1986))); *see also Celotex*, 477 U.S. at 325 (holding that the moving party may obtain summary judgment by showing an absence of proof for the nonmovant's claims).

Furthermore, Davidson's responses to Spanel's other accommodation requests were not materially adverse. Davidson denied these requests because the essential functions of Spanel's job required her to work on-campus a minimum of thirty hours a week, communicate with CCC's personnel, management and students in a variety of modalities, and teach between fifteen and eighteen instructional units per semester. These requirements are not "significant harms" that would "deter a reasonable employee from complaining about discrimination." *White*, 548 U.S. at 69. Nor did Davidson's denial of Spanel's request to bring her service dog[12] to work result in a material adversity. While Spanel's request asserts that her dog helps her manage her symptoms, she has not shown that she is unable to perform the essential functions of her job without him. *Cf. McConnell v. Anixter, Inc.*, 944 F.3d 985, 989 (8th Cir. 2019) (holding, under the Uniformed Services Employment and Reemployment Rights Act, that the denial of a request for a service dog to manage PTSD symptoms was not materially adverse because "[the plaintiff] was still able to perform the essential functions of his job"). Indeed, despite the denial of these requests, the record shows that Spanel continues to be a successful English instructor. Spanel was nominated for two awards, and received one, and her current supervisor praised her teaching ability in her 2020 evaluation. Spanel's ability to teach effectively without these accommodations further proves that denying these accommodations was not materially adverse. *See Hill*, 696 F.3d at 715 (stating that a prima facie retaliation case requires "materially adverse consequences to the employee" and

---

[12] In her accommodation request to bring her service dog, Spanel does not state that her service dog is trained in any way to help her perform the essential functions of her job. Instead, the request asserts Spanel needed to bring the dog with her to work because he acts as an "extra set of eyes and ears that eases [Spanel's] mind and allows her to concentrate on the task as hand." Filing 118 at 162.

noting that the plaintiff "suffered no loss of pay, reduction in hours or responsibilities, or exclusion from training and advancement opportunities").

Finally, Waddle's response to Spanel asking to teach ENGL 1040 as a hybrid was not materially adverse. After Spanel informed Waddle that she wished to teach ENGL 1040 as a hybrid to accommodate her disability during her disability-accommodation appeal, Waddle replied that Spanel had not made this request to Davidson first. Filing 118 at 166, 216, 219. Waddle told Spanel that she needed to request to teach ENGL 1040 as a disability accommodation to Davidson before he would review it. Filing 118 at 216. After communicating with Waddle, Spanel did not make this request to Davidson. Filing 118 at 205.

Spanel now claims that she asked to teach ENGL 1040 as a hybrid pursuant to her initial request to teach a "mixture of modalities." Filing 139 at 37. The record does not support her assertion. Her initial request did not mention changing a particular class from an online format to a hybrid format. Instead, her request to teach a "mixture of modalities" was to further her desire to "work from home," Filing 118 at 161, which would have been frustrated by changing an online class into a hybrid format. In fact, Spanel's past accommodation requests sought to have her be assigned to teach a section of ENGL 1040 *online* rather than as a hybrid.[13] *See* Filing 141-9 at 2; Filing 143-15 at 4. Waddle did not outright deny Spanel's request to teach ENGL 1040 as a hybrid; he only required Spanel to submit this request to Davidson first. Requiring Spanel to submit accommodation requests through CCC's normal procedures—which included Davidson making an initial review—is not materially adverse.

---

[13] To the extent that Spanel contends that the mere denial of her proposal to teach ENGL 1040 as a hybrid is materially adverse, the Court concludes that not being able to teach a desired format of a class is a trivial, rather than a significant harm. Spanel has provided no evidence of how Defendants' denial of her ENGL 1040 hybrid class affected her employment. Indeed, asking to teach an online section of ENGL 1040 as a hybrid contradicts her desire to "work from home as much as possible." Filing 118 at 161.

Even assuming that CCC's responses to Spanel's accommodation requests are materially adverse, Spanel does not come close to proving that Defendants' reasons for denying her requests are pretextual. The record shows that Davidson provided nonretaliatory reasons for denying some of Spanel's requests. Davidson explained that Spanel's job required her to be on campus at least thirty hours per week and to teach between fifteen and eighteen instructional units per semester. Filing 118 at 241. She also told Spanel that her request to limit the way she communicated with Fuchser, Waddle, and Davidson was unreasonable because interacting with CCC personnel was an essential job function and her request was impractical. Filing 118 at 241–42. As to Spanel's request to bring her service dog, Davidson clarified that her request was deficient because Spanel did not tie the assistance her dog provided to a specific job function. Filing 118 at 241. Spanel has failed to present any evidence that these explanations are simply cover for Davidson's alleged retaliatory motive.

Moreover, Davidson provided a proper explanation for why she stated that CCC would "strive" to accommodate Spanel's classroom and scheduling requests. According to Davidson, supervisors and employees work together on how to offer courses at CCC. Filing 141-8 at 14. The course offerings must work for CCC's schedule and for its students. Filing 141-8 at 13. As an HR generalist, Davidson does not participate in the process of deciding what format a faculty member gets to utilize in teaching a specific class. Filing 141-8 at 14–15. Spanel does not demonstrate that this explanation is a guise for an underlying retaliatory animus.

Attempting to show that Davidson and Waddle acted with a retaliatory motive, Spanel points to two other faculty members she claims were allowed to work remotely without having to undergo the same process she did. Filing 139 at 20–21. One faculty member, Amy Wahlmeier, received permission from Kemp and Waddle to work remotely while she was pregnant to help

alleviate symptoms from herniated disks. Filing 140-12 at 2. Kemp allowed the other faculty member, Jeremy Broyles, to teach remotely for six months when a family member of Broyles was diagnosed with cancer. Filing 140-56 at 1. "In proving pretext by showing that similarly situated employees were treated more leniently, the plaintiff's 'comparators' must be 'similarly situated in all relevant respects.'" *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (quoting *Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013)). "At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'" *Henry v. Hobbs*, 824 F.3d 735, 739 (8th Cir. 2016) (quoting *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 956 (8th Cir. 2012)).

Spanel's comparator evidence fails to pass muster. First, Davidson and Waddle had nothing to do with the decision to allow Broyles to work remotely. Filing 143-22; *see Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 613 (8th Cir. 2014) ("[I]ndividuals used for comparison must have dealt with the same supervisor . . . ." (quoting *Bone*, 686 F.3d at 956)). Moreover, the nature of Broyles's and Wahlmeier's requests were distinct from Spanel's. CCC temporarily allowed Wahlmeier to work remotely because of the effect her pregnancy had on her herniated disks, not to accommodate a disability. CCC also allowed Broyles to temporarily work remotely so that he could help care for a family member with cancer. In contrast, Spanel requested that she be allowed to work from home indefinitely and on a part time rather than full time basis (only when she was not required to be on campus for classes, office hours, or meetings). Her request was made in the context of a disability accommodation to help alleviate symptoms affiliated with her anxiety disorder and PTSD. These factual differences—the temporal length between Spanel's indefinite request and Wahlmeier's and Broyles's temporary arrangements, the different symptoms Wahlmeier and Spanel sought relief from, and the fact that Broyles's, Wahlmeier's and Spanel's

requests were for different purposes—prevent Spanel from using Wahlmeier and Broyles as comparisons to establish pretext. There are numerous legitimate reasons why CCC would temporarily allow a pregnant employee or an employee with an ailing family member to work remotely while denying Spanel's indefinite accommodation request to work from home when not required to be on campus to help her manage her generalized anxiety disorder and her PTSD.

g.   Spanel's Claims in the Aggregate

Finally, Spanel claims that, considered together, all the alleged retaliatory acts constitute retaliation. Filing 139 at 30. The Court disagrees. "[I]t is proper to consider the cumulative effect of an employer's alleged retaliatory conduct . . . ." *Fercello*, 612 F.3d at 1083–84. But when a plaintiff seeks to prove retaliation by cobbling together multiple actions, the alleged misconduct must be "extreme, systemic retaliatory conduct resulting in serious employment consequences." *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007) (overruled on other grounds). According to Spanel, she engaged in protected conduct in May of 2016 when she gathered faculty complaints against CCC's administration through an anonymous survey and presented them to her state union representative. Filing 139 at 19. In the ensuing four years, Spanel alleges that several members of CCC's administration, ranging from an HR generalist to two different college presidents, subjected her to an agglomeration of materially adverse employment actions because she organized an anonymous faculty survey. "Context matters," *White*, 548 U.S. at 68, and the context of this case shows several isolated incidents over the course of four years that involved, at most, petty annoyances rather than serious harms, actions for which Defendants provided nonretaliatory explanations, or decisions for which any connection to Spanel's protected

activity is tenuous.[14] *See Fercello*, 612 F.3d at 1078–84 (holding that, over the course of nineteen months, changing the plaintiff's parking space and office, exclusion from meetings and email lists, negative performance reviews, oral warnings and poor treatment, constant surveillance, and eventual discharge did not cumulatively constitute a materially adverse employment action); *Devin*, 491 F.3d at 785–88 (holding that denying pay guarantees allegedly granted to male employees, interfering with inventory, allegedly unfair discipline, denial of equipment, and the employer's supposed failure to investigate complaints did not, in the aggregate, constitute a materially adverse employment action). Moreover, for several of the allegedly materially adverse actions, CCC has provided nonretaliatory reasons that Spanel has not shown are pretextual. Spanel has not proven that she suffered materially adverse employment actions that would likely dissuade a reasonable employee from engaging in protected conduct, nor has she shown that CCC's explanations for its actions are pretextual. Whether considered separately or together, these actions do not support her claim. Thus, her Title VII and NFEPA retaliation claims fail.

3. *Spanel's Title VII Sex Discrimination Claim, NFEPA Sex and Disability Discrimination Claim, ADA Disability Discrimination Claim, Equal Protection Claim, and First Amendment Retaliation Claim*

Having concluded that Spanel's Title VII and NFEPA retaliation claims fail, the Court addresses her Title VII sex discrimination claim, her NFEPA sex and disability discrimination

---

[14] To the extent Spanel alleges that CCC's failure to investigate her claims of retaliation constitute a materially adverse employment action, the record does not support her contention. "[A]n employer's total failure to address discrimination complaints might constitute a retaliatory action sufficient to meet the [materially adverse] standard . . . ." *Devin*, 491 F.3d at 787. But CCC did investigate Spanel's retaliation claims. After Spanel responded to her May 5, 2016 evaluation by stating she was suffering from retaliation, a CCC employee met with Spanel to discuss her concerns. Filing 118 at 32, 103. Spanel refused to provide him with additional information. Filing 118 at 32, 103. Moreover, when CCC's Board of Governors received a letter from a former CCC faculty member stating that Spanel was experiencing retaliation and discrimination, they conducted an investigation by calling defendant Smith, the President of CCC at the time, into a meeting to question him about the letter's contents. Filing 141-27 at 25; Filing 141-31 at 3–4. Spanel may wish that Defendants took more action, but the record does not show a "total failure" to investigate her claims of retaliation.

claim, her ADA disability discrimination claim, her Equal Protection claim, and her First Amendment retaliation claim.[15] As explained above, all her discrimination and retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Stewart*, 481 F.3d at 1042; *Warmington*, 998 F.3d at 797; *Hager*, 735 F.3d at 1014; *Agnew*, 590 N.W.2d at 693. The *McDonnell Douglas* framework requires Spanel to show she suffered an adverse employment action and, if she is able to, that Defendants' nonretaliatory and nondiscriminatory reasons are pretextual. *See McDonnell Douglas*, 411 U.S. at 802. However, while an adverse employment action in the Title VII and NFEPA retaliation context is one that is "materially adverse," for Spanel's remaining retaliation and discrimination claims an adverse employment action "is a tangible change in working conditions that produces a material employment disadvantage." *Sellers*, 791 F.3d at 942 (quoting *Thomas v. Corwin*, 483 F.3d 516, 528 (8th Cir. 2007)); *see also Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633 (8th Cir. 2016) ("An adverse employment action in the retaliation context is similar to an adverse action under the discrimination standard . . . ."). A material employment disadvantage includes "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage," do not meet this standard. *Id.* When alleging that an employer's actions cumulatively caused an adverse employment action, the plaintiff must show a "particularly extreme set of facts" and "systemic bad treatment." *Id.* (quoting *Higgins v. Gonzales*, 481 F.3d 578, 588 (8th Cir. 2007) (abrogated on other grounds)).

---

[15] Spanel claims that Defendants violated the First Amendment by retaliating against her for her involvement in the anonymous faculty survey, filing two EEOC complaints against CCC, and filing this lawsuit. Filing 56 at 58.

As the bases for Spanel's Title VII sex discrimination claim, her NFEPA sex and disability discrimination claim, her ADA disability discrimination claim, her Equal Protection claim, and her First Amendment retaliation claim, Spanel points to the same conduct she argued was materially adverse in her Title VII and NFEPA retaliation claims. These include her two evaluations, her performance improvement plan, Defendants' alleged failure to promote her to the Interim Associate Dean position, Defendants' responses to her accommodation requests, and the other minor conduct previously outlined in this Order. Spanel, however, does not explain how these various actions were forms of sex discrimination to support her Title VII and Equal Protection sex discrimination claims. *See Hager*, 735 F.3d at 1015 (dismissing sex discrimination claim under the Equal Protection Clause when the plaintiff failed to allege facts showing that "similarly situated employees were treated differently" or that anyone made "gender-related comments" before she suffered an adverse employment action); *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 (8th Cir. 2007) (stating that a prima facie case for Title VII sex discrimination requires proof that gives "rise to an inference of sex discrimination"). Spanel has likewise neglected to show that these actions were taken "because of" Spanel's disability as required for her NFEPA and ADA disability discrimination claims. *See Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1183 (8th Cir. 2019) (dismissing disability discrimination claim because the plaintiff failed to show that the alleged adverse actions were taken "because of his disability"). Although Defendants have not moved to dismiss these claims for these fatal omissions, the Court concludes that Spanel has not provided any proof that Defendants discriminated against her on the basis of her sex or disability. *See Est. of Barnwell by & through Barnwell v. Watson*, 880 F.3d 998, 1004 (8th Cir. 2018) ("[T]here must still be enough evidence to allow a rational trier of fact to find for the [plaintiffs] on the required elements of their claim. And while the non-moving party

44

receives the benefit of all reasonable inferences supported by the evidence, the non-moving party is still obliged to come forward with specific facts showing that there is a genuine issue for trial." (internal citation omitted)); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Moreover, as with Spanel's Title VII and NFEPA retaliation claims, she cannot show an adverse employment action and, even if she could, she fails to demonstrate that Defendants' proffered reasons are pretextual. Defendants did not terminate Spanel's employment, reduce her wages, or conduct themselves in a way that "significantly affect[ed] [Spanel's] future career prospects." *Kelleher*, 817 F.3d at 633. In fact, as Defendants point out, Spanel has had her salary increased, her employment contract renewed, and has obtained tenure. Many of the actions Spanel complains of are, at most, "minor changes in working conditions that merely inconvenience[d] [her] or alter[ed] [her] work responsibilities . . . ." *Spears v. Mo. Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 853 (8th Cir. 2000).

Even if Spanel could show a "material employment disadvantage," she fails to show pretext. As thoroughly outlined in the Court's analysis of her Title VII and NFEPA claims, Defendants have put forward legitimate reasons explaining their conduct. For example, as to Spanel's failure-to-promote claim, the record shows that Fuchser acted with limited time to select Keasling, who she believed to be the best candidate, to become Interim Associate Dean of Academic Education. Spanel has not demonstrated that Fuchser and Defendants did not consider her to retaliate or discriminate against her. Likewise, as to Spanel's argument that Davidson and defendant Waddle retaliated and discriminated against her for denying some of her accommodation requests, the record shows that Davidson denied some of Spanel's requests because she believed they violated essential functions of Spanel's job and because Spanel had

45

failed to provide sufficient information justifying her need for an accommodation. Spanel has not demonstrated that these explanations are pretextual either.

Taken together, Defendants actions do not constitute an "extreme set of facts" that subjected Spanel to systemic poor treatment. Rather, the record reflects that a series of isolated incidents occurred over a four-year period that resemble dissatisfactions common to the workplace. Spanel fails to show that, in the aggregate, Defendants' conduct constituted one unlawful adverse employment action. Accordingly, the Court grants Defendants' summary judgment on Spanel's Title VII sex discrimination claim, her NFEPA sex and disability discrimination claim, her ADA disability discrimination claim, her Equal Protection claim, and her First Amendment retaliation claim.

### E.  Spanel's Hostile-Work-Environment Claims

Spanel has also brought retaliatory harassment hostile-work-environment claims against CCC under Title VII, the NFEPA, and the First Amendment.[16] According to Spanel, CCC engaged in harassment and created a hostile work environment because she helped bring complaints against CCC's administration through an anonymous faculty survey. Filing 56 at 52–58. Defendants argue that Spanel has not shown that the alleged harassment was so "severe and pervasive" as to create a hostile work environment. Filing 117 at 27. The Court agrees.

Retaliation claims can "be based on a hostile work environment and need not be based solely on discrete adverse employment actions that affect the terms or conditions of employment." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042 (8th Cir. 2007); *see also Tyler*, 628 F.3d at 986 ("First Amendment retaliation claims are analyzed under the same framework as claims of

---

[16] Spanel also brings a retaliatory hostile-work-environment claim under the Fourteenth Amendment. However, because retaliation claims are not actionable under the Fourteenth Amendment, this claim fails. *See Burton*, 737 F.3d at 1237 ("We have only recognized that '§ 1983 provides a vehicle for redressing claims of retaliation on the basis of the First Amendment.'" (quoting *Tyler*, 628 F.3d at 986)).

retaliation under Title VII."); *Knapp*, 901 N.W.2d at 43 ("[T]he NFEPA is patterned after federal Title VII and . . . it is appropriate to look to federal court decisions construing Title VII for guidance with respect to the NFEPA."). To establish a hostile-work-environment claim, Spanel must show "(1) [she] is a member of a protected class, (2) [she] was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic under Title VII, (4) the harassment affected a term, condition or privilege of employment, and (5) employer liability." *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1038 (8th Cir. 2005). The harassment must be "so severe or pervasive as to constitute a materially adverse action." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 807 (8th Cir. 2019). "The standard for demonstrating a hostile work environment under Title VII is 'demanding,' and 'does not prohibit all verbal or physical harassment and it is not a general civility code for the American workplace.'" *Jackman*, 728 F.3d at 806 (quoting *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 953 (8th Cir. 2011)).

To begin, Spanel's Brief in Opposition does not address her hostile-work-environment claims or identify the allegedly harassing conduct. *See United of Omaha Life Ins. Co. v. Honea*, 458 F.3d 788, 791 (8th Cir. 2006) ([T]he party opposing summary judgment may not rest on the allegations in its pleadings; it 'must set forth specific facts showing that there is a genuine issue for trial.'" (quoting Fed. R. Civ. P. 56(e))). The Court assumes, therefore, that her hostile-work-environment claims are based solely on the conduct Spanel uses to support her other retaliation and discrimination claims. As the Court has already concluded, these actions either did not constitute materially adverse employment actions or Defendants have proffered non-pretextual reasons for their conduct. Even considering Defendants' responses to Spanel's 2017 and 2018 requests for accommodation, which the Court excluded from the other claims due to Spanel's failure to exhaust her administrative remedies, does not move the needle in Spanel's favor. The

2017 and 2018 accommodation requests and the responses to those requests were similar to the ones made during Spanel's 2019 accommodation request which the court has already concluded do not create an actionable retaliation claim. *Compare* Filing 141-9 at 1–8 (2017 accommodation request), *and* Filing 141-10 at 1–2 (response to 2017 accommodation request), *with* Filing 143-15 at 3–8 (2018 accommodation request), *and* Filing 144-31 at 5–6 (response to 2018 accommodation request). Therefore, they do not assist Spanel in making a hostile-work-environment claim.

In *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, the Eighth Circuit rejected a hostile-work-environment claim when "[t]he incidents took place during a span of over three years and were relatively infrequent." *Jackman* 728 F.3d at 806. That same situation is present here. Spanel has pointed to conduct that occurred sporadically over a four-year period, much of which constituted minor frustrations that many Americans encounter at their jobs. The record does not support Spanel's contention that she suffered from a hostile work environment: she has failed to show that Defendants' actions affected a term, condition, or privilege of employment, that they were so severe or pervasive that they formed a materially adverse action, or that Defendants' explanations for their actions are pretextual. Thus, CCC is entitled to summary judgment on Spanel's hostile-work-environment claims.

### F.  Supervisor-Liability Claim

In passing, Spanel brings a supervisory-liability claim against the individual defendants, Waddle, Gostchall, and Smith, claiming that they are liable for their subordinates violating Spanel's First Amendment Rights by retaliating against her for her involvement in the anonymous faculty survey, filing two EEOC complaints against CCC, and filing this lawsuit. Filing 56 at 58–60; Filing 139 at 38. This claim fails because, as already previously outlined, Spanel suffered no adverse employment action and thus she cannot maintain a cause of action for First Amendment

retaliation. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007) (affirming dismissal of supervisory liability claim where "the alleged facts [did] not establish an underlying constitutional violation"). The Court grants Defendants summary judgment on Spanel's supervisory liability claim.

### G. Spanel's Reasonable Accommodation Claim

Finally, the Court addresses Spanel's reasonable accommodation claim under the ADA and the NFEPA against CCC. Under the ADA and the NFEPA, employers may not discriminate against employees by "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(5)(A); Neb. Rev. Stat. § 48-1107.02(e). In her failure-to-accommodate claim, Spanel "must first make a facial showing that [she] has an ADA disability and that [she] has suffered [an] adverse employment action." *Gardea v. JBS USA, LLC*, 915 F.3d 537, 541 (8th Cir. 2019) (third alteration in original) (quoting *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)); *see also Faulkner v. Douglas Cnty.*, No. 8:15CV303, 2016 WL 7413469, at *6 (D. Neb. Dec. 22, 2016), *aff'd*, 906 F.3d 728 (8th Cir. 2018) ("When applying NFEPA to cases involving disability, the Nebraska Supreme Court follows the same analysis as used by federal courts in cases brought pursuant to the ADA."). Spanel must then show that she is a "qualified individual." *Gardea*, 915 F.3d at 541 (quoting *Fenney*, 327 F.3d at 712). Once Spanel makes this showing, "[t]he burden then shifts to [CCC] to show that it is unable to accommodate [Spanel]." *Id.* (quoting *Fenney*, 327 F.3d at 712). The Court concludes that Defendants are entitled to summary judgment on Spanel's failure-to-accommodate claims.

*1.   Failure-to-Accommodate Claim for Spanel's 2016 Accommodation Request*

The Court turns to Spanel's claim that CCC failed to accommodate her disability in 2016. On October 26, 2016, Spanel requested that CCC transfer her from a cubicle to an office to help her manage her anxiety disorder. Filing 143-9 at 1–3. Davidson, an HR generalist at CCC, asked Spanel to provide her more documentation from a qualified physician. Filing 144-22 at 2. Later, Davidson placed Spanel in a recording room that was near her colleagues. Filing 141-8 at 10; Filing 143-10 at 1–2. Spanel appealed Davidson's decision to defendant Waddle, the Vice President of Human Resources at CCC, stating that she had concerns about the recording room being too small and that some disabled students may not be able to fit through the narrow door to the recording room. Filing 143-11 at 3–11. Spanel also took issue with Associate Dean Kemp, Spanel's former supervisor who at the time was on a leave of absence, being informed of her accommodation request and the nature of her disability. Filing 143-11 at 3–4.

 On December 20, 2016, Waddle granted Spanel's appeal and agreed to transfer her to a different office once that office's current occupant vacated it at the end of the semester. Filing 143-11 at 1. Waddle also explained that CCC informed Kemp about Spanel's accommodation request because CCC expected Kemp to resume her duties as Associate Dean of Academic Education in January of 2017 and thus needed to know about Spanel's disability accommodation. Filing 143-11 at 1. On January 5, 2017, Spanel moved into her new office. Filing 144-1 at 5.

CCC argues that Spanel cannot maintain a failure-to-accommodate claim for Spanel's 2016 request for accommodation because the evidence shows that CCC granted her request and moved her into an office in January of 2017. Filing 117 at 44. The Court agrees. Rather than fail to accommodate Spanel, the undisputed evidence shows that CCC gave her exactly what she wanted.

Spanel argues that, even though CCC did provide her a private office, they failed to engage in the interactive process in good faith. The interactive process is an informal dialogue between the employer and employee used to determine what disability accommodations are reasonable and necessary. *See* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."). However, there is no per se liability for failing to engage in the interactive process. *See Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013). Nor does the evidence show that CCC "did not in good faith assist [Spanel] in seeking accommodations." *Kallail v. Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 933 (8th Cir. 2012). Spanel's failure-to-accommodate claim for her 2016 request for accommodation fails.

### 2. Failure-to-Accommodate Claim for Spanel's 2019 Accommodation Request

Spanel's final remaining claim is that CCC failed to accommodate her disability in response to her 2019 accommodation request. In her 2019 accommodation request, Spanel asked (1) that she be allowed to work from home when she was not teaching in-person classes, conducting office hours, or attending required meetings; (2) that she be able to bring her service dog to work; (3) that she be allowed to "teach a mix of online, web-blended, and lecture courses each semester"; (4) that her instructional load be limited to sixteen instructional units per semester; (5) that CCC receive Spanel's approval before assigning an overloaded schedule; and (6) that communication between Spanel and Kathy Fuchser, Chris Waddle, and Angela Davidson be conducted via email or a "WebEx meeting," or with at least twenty-four hours' notice and with a

51

personal representative or her dog present.[17] Filing 141-12 at 3–8. On January 8, 2020, Davidson responded to Spanel's requests. Davidson first stated that Spanel's request to work from home when not conducting in-person lectures, holding office hours, or attending required meetings was unreasonable because it violated Spanel's essential job function of being on campus at least thirty hours per week. Filing 118 at 241. As to Spanel's request to bring her dog to work as needed, Davidson explained that Spanel had not tied the services her dog provides to a specific job function that she could not perform, and thus had not provided sufficient information to CCC for it to grant the accommodation. Filing 118 at 241. Davidson further declined to limit Spanel's workload to sixteen instructional units per semester because working between fifteen and eighteen instructional units per semester was an essential job function. Filing 118 at 241. Finally, Davidson rejected Spanel's request to limit the way in which she communicated with Fuchser, Waddle, and Davidson because it was unreasonable. Filing 118 at 241–42.

Spanel appealed Davidson's determination to defendant Waddle, the Vice President of Human Resources at CCC. Filing 118 at 166. In her appeal, Spanel stated that she wanted to teach an online section of her ENGL 1040 course as a hybrid pursuant to her request to teach a "mixture of modalities." Filing 118 at 168–73, 219. Spanel also took issue with Davidson responding that CCC would "strive" to provide several of her accommodation requests because it did not guarantee the CCC would, in fact, accommodate her. Filing 118 at 166–68. Waddle denied her appeal. He first noted that CCC was accommodating Spanel's request to teach a "mixture of modalities" by allowing her to speak with her supervisor about teaching classes in different formats and that she was currently teaching classes in a mixture of formats. Filing 118 at 216. He further stated that

---

[17] To the extent Spanel claims that CCC denied her request for a shortened workweek, that CCC refrain from assigning her classes beginning at 9:00 AM, and that CCC provide her a class with reduced environmental and structural triggers, Spanel has failed to show that CCC did not, in fact, grant these requests as the Court noted when analyzing her Title VII retaliation claim.

Spanel had not requested teaching ENGL 1040 as a hybrid course to Davidson, and that all accommodation requests had to go to Davidson first. Filing 118 at 216.

CCC first argues that Spanel cannot bring a failure-to-accommodate claim for her request to teach ENGL 1040 as a hybrid course because she failed to provide notice that she was requesting to teach ENGL 1040 as a hybrid course to accommodate her disability. Filing 117 at 44–45; Filing 145 at 21–22. The Court agrees. To give notice of her accommodation request, Spanel needed to make CCC "aware of the need for an accommodation," and "provide relevant details of [her] disability and, if not obvious, the reason that [her] disability require[d] an accommodation." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007). Once she had provided notice, CCC had to "make a reasonable effort to determine the appropriate accommodation." *Id.* (quoting *Cannice v. Nw. Bank Iowa N.A.*, 189 F.3d 723, 727 (8th Cir. 1999)).

Spanel's original request asked CCC to allow her to teach "a mix of online, web-blended, and lecture courses each semester." Filing 141-12 at 6. The request further explained that Spanel "should be allowed to work from home as much as possible" and recommended that Spanel teach "a maximum of nine instructional units a week in a face to face (lecture-based) setting with the remaining hours taught in an online (web) or blended format." Filing 141-12 at 7. Given the fact that Spanel's request to teach an online section of her ENGL 1040 course in a hybrid format is incongruous with her other request to "work from home as much as possible," Filing 141-12 at 7, Spanel needed to explain why changing her online class to a hybrid one would accommodate her generalized anxiety disorder and her PTSD.[18] *Cf. Hustvet v. Allina Health Sys.*, 910 F.3d 399, 410–11 (8th Cir. 2018) ("[I]n order for the accommodation to be reasonable, the request must relate to the individual's disability."). Spanel failed to provide an explanation, however. Spanel only told

---

[18] The Court further notes that, in her past accommodation requests, Spanel asked to be assigned to teach a section of ENGL 1040 *online* rather than as a hybrid. *See* Filing 141-9 at 2; Filing 143-15 at 4.

defendant Waddle that she wanted "to spend more time with the students in a partial face-to-face modality," Filing 118 at 219, and that teaching a mixture of class formats (in-person, online, and hybrid) would reduce her symptoms. This explanation is insufficient to inform CCC why Spanel needed to change one of her online courses into a hybrid course. The Court concludes Spanel failed to provide notice to CCC that she was requesting to teach ENGL 1040 as a hybrid to accommodate her disability.[19]

As to the remaining requests CCC denied, CCC argues that because Spanel has failed to prove she suffered an adverse employment action she cannot maintain her failure-to-accommodate claim. Filing 117 at 44. CCC further contends that Spanel's failure-to-accommodate claim fails because CCC has already provided her with reasonable accommodations. Filing 117 at 44. Both Eighth Circuit and Nebraska caselaw consider denial of a reasonable accommodation to be an adverse employment action for the purposes of failure-to-accommodate claims. *See Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) ("In a reasonable accommodation case, the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations."); *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016) ("An employer is . . . liable for committing an adverse employment action if the employee in need of assistance actually requested but was denied a reasonable accommodation."); *Marshall v. Eyecare Specialties, P.C. of Lincoln*, 876 N.W.2d 372, 386 (Neb. 2016) (stating that failure-to-accommodate under the NFEPA requires an adverse

---

[19] To the extent Spanel claims that she had asked her supervisor, Deffenbaugh, to teach ENGL 1040 as a hybrid to accommodate her disability, there is no evidence that Deffenbaugh understood this as a disability accommodation request. Filing 143-2 at 32 (Spanel stating that she did not know if she told Deffenbaugh she wanted to teach ENGL 1040 as a hybrid course to accommodate her disability); Filing 143-27 at 9–10 (Deffenbaugh stating that he understood Spanel's accommodation to be teaching classes in "different modalities that were available to be taught" and that Spanel asked to teach a hybrid course "to better serve her students"); *see also* Filing 143-29 at 35 (Dean Clark stating that he did not understand Spanel's request to teach ENGL 1040 as a hybrid to be a disability accommodation).

employment action). The question, therefore, is whether CCC denied accommodation requests made by Spanel and whether those requests were reasonable.

The Court first concludes that Spanel has failed to show that some of her accommodation requests were reasonable. *See Scruggs v. Pulaski Cnty.*, 817 F.3d 1087, 1093 (8th Cir. 2016) ("[A]n employer only has to provide an accommodation that is reasonable."). While "there is no precise test for what constitutes a reasonable accommodation, . . . an accommodation is unreasonable if it requires the employer to eliminate an essential function of the job." *Convergys*, 491 F.3d at 796 (citing *Dropinski v. Douglas Cnty.*, 298 F.3d 704, 709 (8th Cir. 2002)). "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). "The employer's judgment about an essential job function 'is considered highly probative.'" *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (quoting *Duello v. Buchanan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010)).

Spanel's 2019 requests included working from home when not teaching in-person classes, conducting office hours, or attending required meetings and capping her instructional load at sixteen instructional units per semester. Filing 141-12 at 5–6. The record shows that CCC considers teaching between fifteen and eighteen instructional units per semester to be an essential function of Spanel's job. Filing 118 at 241 (Davidson stating that teaching fifteen to eighteen units was an essential function). Spanel has provided no evidence to dispute CCC's contention. Thus, limiting the number of units Spanel teaches per semester violated an essential function of her job and, therefore, was unreasonable. Moreover, the record reflects that CCC requires instructors like Spanel to work thirty hours on-campus per week.[20] Filing 118 at 240 (Davidson explaining that

---

[20] The fact that two other instructors were allowed to work remotely is irrelevant. The Court has already determined in its Title VII analysis that this comparator evidence fails because the two other instructors are not similarly situated to Spanel. Critically, the other instructors were allowed to work remotely on a temporary basis, while Spanel asked to

Spanel needed to maintain her thirty-hour-on-campus requirement despite having a four-day on-campus workweek); Filing 143-46 (Waddle agreeing that being on-campus thirty hours a week is required); Filing 143-16 at 6 (Spanel acknowledging that CCC employees have a thirty-hour, on-campus workweek requirement). This requirement ensures that instructors are available for CCC's students. Filing 118 at 240–41; Filing 141-8 at 13. Spanel has not demonstrated that she could fulfill this essential job function if she only worked on campus when teaching in-person classes, conducting office hours, or attending required meetings. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012) ("[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." (quoting *Wingate v. Gage Cnty. Sch. Dist., No. 34*, 528 F.3d 1074, 1078 (8th Cir. 2008))). Because granting this request would eliminate an essential function of her job, it is unreasonable and the ADA does not compel that CCC provide it. *See Alexander v. Northland Inn*, 321 F.3d 723, 728 (8th Cir. 2003) (affirming dismissal of a failure-to-accommodate claim when the plaintiff's requested accommodations eliminated an essential function of her job).

Spanel's desire to limit the way she communicated with Waddle, Fuchser, and Davidson was also unreasonable. The evidence shows that interacting with CCC's personnel and management in a variety of formats is an essential function of Spanel's job. Filing 118 at 241–42; Filing 141-11 (Davidson explaining that email cannot be the only mode of communication). Moreover, as Davidson and Waddle explained during their depositions, it was not possible for CCC to guarantee that Spanel would only have to communicate with Waddle, Fuchser, and

---

work from home as much as possible indefinitely. CCC temporarily allowing remote work does not mean that working thirty hours on campus is not an essential function of Spanel's job. As the Eighth Circuit has emphasized, "[a]n employer does not concede that a job function is non-essential simply by voluntarily assuming the limited burden associated with a temporary accommodation . . . ." *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 812 (8th Cir. 2015) (alteration in original) (quoting *Rehrs v. Iams Co.*, 486 F.3d 353, 358 (8th Cir. 2007)). Thus, the temporary non-disability-related accommodations of the two other faculty members has no bearing on the essential functions of Spanel's job.

Davidson by email or through "WebEx" meetings, and that her requested limits impeded CCC's ability to conduct its business efficiently. Filing 141 at 17–18; Filing 143-46 at 4. The record also shows that CCC considered Spanel's request to receive at least twenty-four hours' notice when having to meet with Waddle, Fuchser, or Davidson in-person and have a personal representative or her dog present to be impractical. Filing 118 at 241–42. CCC is not required to implement an accommodation that is impractical or unduly inhibits its ability to operate as a college. *See Dropinski*, 298 F.3d at 707 (observing that an employer does not have to provide an accommodation that "would impose an undue hardship on the operation of the business of [the employer]" (alteration in original) (quoting *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001))); *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) (noting that an accommodation is unreasonable if it would impose an undue administrative burden). Spanel has not put forward any evidence to rebut CCC's assertions about the impracticality of her requested accommodations. *See Collins v. Abbott Lab'ys, Inc.*, 972 F.3d 976, 978 (8th Cir. 2020) (noting that an ADA plaintiff must show that "a reasonable accommodation is possible" (quoting *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999))). Accordingly, CCC's denial of Spanel's request to limit the way she communicated with Waddle, Fuchser, and Davidson was not a failure to provide a reasonable accommodation.

Finally, the Court addresses Spanel's request to teach "a mixture of modalities" and her desire to bring her dog to work. First, the undisputed evidence shows CCC has fulfilled Spanel's request to teach "a mixture of modalities." In her accommodation request, Spanel advised that she wanted to teach a maximum of nine instructional units in person with her remaining hours filled with online *or* hybrid classes. Filing 141-12 at 7. The record shows that Spanel has been teaching in-person and online classes since 2017. Filing 118 at 205. There is therefore no evidence that

CCC failed to accommodate her request to teach "a mixture of modalities." As to CCC's denial of Spanel's request to bring her dog to work, there is no evidence that, with the accommodations CCC has otherwise provided, Spanel is unable to perform the essential functions of her job. *See Naca v. Macalester Coll.*, 947 F.3d 500, 502 (8th Cir. 2020) ("[The plaintiff] admitted that with the accommodations provided, she was performing the essential functions of an assistant professor, which, on de novo review, defeats her claim as a matter of law."); *cf. McConnell*, 944 F.3d at 989 (holding that the denial of a request for a service dog did not violate the Uniformed Services Employment and Reemployment Rights Act because the plaintiff was still performing the essential functions of his job). Indeed, the record shows that Spanel has been performing the duties of an English instructor admirably with the accommodations CCC is currently providing. Spanel has received praise in her evaluations for her teaching ability and was nominated for two awards, of which she received one.

Spanel's failure-to-accommodate claim for her 2019 accommodation request is analogous to the failure-to-accommodate claim the Eighth Circuit found inadequate in *Burchett v. Target Corp.*, 340 F.3d 510 (8th Cir. 2003). In *Burchett*, the plaintiff was an employee of Target who suffered from depression. *Burchett v. Target Corp.*, 340 F.3d 510, 513 (8th Cir. 2003). Target attempted to accommodate the plaintiff's disability by restructuring her workload, limiting the number of hours she worked, and providing a flexible schedule. *Id.* at 517. The plaintiff sued Target under the ADA, arguing that Target should have accommodated her by transferring her to a different department. *Id.* at 517–18. The Eighth Circuit rejected her claim, holding that the plaintiff "did not show that with the accommodations Target had provided she was unable to perform the duties of her position because of her depression." *Id.* at 518. Thus, the plaintiff had not established that Target "failed to provide reasonable accommodation for her disability." *Id.*

58

The same result is warranted in this case. There is no evidence that Spanel is unable to perform the essential function of her job with the several accommodations CCC has provided her. Although Spanel may be displeased with some of CCC's responses, "[a]n employer is not required to provide the specific accommodation requested or preferred by an employee." *Scruggs*, 817 F.3d at 1093. The Court concludes that Defendants are entitled to summary judgment on Spanel's ADA and NFEPA failure-to-accommodate claims for her 2019 accommodation request.

### H.   The Parties' Other Motions

Defendants have filed a motion to strike a document titled "Plaintiff's Third Amended Complaint Facts," which Spanel filed as an exhibit to support her Brief in Opposition to Defendants' Motion for Summary Judgment. Filing 140-2 at 1–46; Filing 146 at 1. Spanel opposed this motion and her counsel candidly admitted that she filed this "exhibit" to circumvent the Court's briefing word limit. *See* NECivR 7.1(d)(1)(A) ("Except with the court's prior permission, a party's supporting brief or opposing brief may not exceed 13,000 words."). Spanel's Third Amended Complaint is not an exhibit; it is merely a recitation of Spanel's allegations. Thus, the Court did not rely on this "exhibit" when ruling on Defendants' Motion for Summary Judgment. Similarly, the Court did not rely on the sur-reply brief Spanel filed with her Motion to File a Sur-Reply, Filing 149. Even if the Court did consider Spanel's "exhibit" and her sur-reply brief, the Court would have issued the same ruling on Defendants' Motion for Summary Judgment. Accordingly, because the Court has now ruled on Defendants' Motion for Summary Judgment, it denies their Motion to Strike and Spanel's Motion to File a Sur-Reply as moot.

Finally, Defendants' have filed a Motion to Exclude the Testimony of Plaintiff's Expert. Filing 152 at 1. Because the Court grants summary judgment to Defendants on all of Spanel's claims, Defendants' Motion to Exclude the Testimony of Plaintiff's Expert is denied as moot.

## IV.   CONCLUSION

The Court concludes that Defendants are entitled to summary judgment on Spanel's claims.

Accordingly,

IT IS ORDERED:

1.   Defendants' Motion for Summary Judgment, Filing 116, is granted;

2.   Defendants' Motion to Strike, Filing 146, is denied as moot;

3.   Spanel's Motion for Leave to File Sur-Reply Brief, Filing 149, is denied as moot;

4.   Defendants' Motion to Exclude Testimony of Plaintiff's Expert, Filing 152, is denied as moot;

5.   Spanel's Third Amended Complaint, Filing 56, is dismissed in its entirety; and

6.   The Court will enter a separate judgment.


Dated this 2nd day of February, 2022.


BY THE COURT:

Brian C. Buescher
United States District Judge